# 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

Norfolk and Western Railway Company v. Birchfield.

September 13, 1906.

1. Witnesses—*Credibility—Showing Bias—Appeal—Harmless Error.*—
It is competent for a party to a suit to show the bias of an adverse
witness, and to prove any fact affecting his credibility before the
jury, and to ask the witness questions for this purpose; but the
refusal to permit such questions to be asked is not reversible error
where the other evidence in the case was sufficient to disclose to
the jury the state of mind and feeling of the witness.

2. Evidence—*Admission of Immaterial Evidence—Harmless Error.*—In
an action for personal injuries the admission of testimony imma-
terial to the case cannot be injurious to the defendant, and, if
erroneous, is harmless error.

3. Evidence—*Testimony as to Relations Between Witnesses and Defen-
dant.*—In an action against a railroad company for personal in-
juries it is competent for the plaintiff to introduce testimony show-
ing that one of the defendant's witnesses was at the time of the
injury, a detective employed by the defendant.

4. Instructions—*Refusal of Instructions—Equivalent Instructions.*—On
the trial of a cause the refusal to give certain instructions is not
error where the instructions given are in substance the same as
those refused, though in different form.

5. Carriers of Passengers—*Action for Assault by Fellow Passenger—
Instructions—Duty of Conductor—Case at Bar.*—In an action by a
passenger against a railroad company for an assault by a fellow
passenger, it was proper to instruct the jury, in response to a
request from them for instructions, that if they believe from the
evidence that the conductor of the train believed, at the time of
the difficulty between the plaintiff and the other passenger, that
such other passenger was a special officer of the railroad company,
then this was a circumstance that could be considered by them on
the question as to whether or not the conductor had notice of the
impending assault on the plaintiff, and believed that he was in

danger of such assault; but that although he may have believed that such passenger was an officer, still, if he had reasonable grounds to believe that he was about to make an assault on plaintiff, it became his duty to interfere and prevent the same, if possible.

6. CARRIERS OF PASSENGERS—*Safety of Passenger—Assault By Fellow Passenger—Liability of Carrier—Duty of Conductor—Case at Bar.*— Railways engaged as carriers of passengers, while not insurers against all injuries except by the act of God or of public enemies, as are carriers of goods, are yet bound to carry safely those whom they take into their coaches in so far as human care and foresight can provide. In the discharge of this duty the carrier is bound to use and exercise the utmost skill and care of a prudent man in taking precautions to prevent one passenger from being injured by the ignorant, negligent, or reckless acts of another. In case of a threatened assault upon a passenger by a fellow passenger, it is the duty of the company's employees to protect the party threatened from injury, and if they negligently fail to do so, the carrier is liable for the consequences. The conductor has the power, and it is his duty, to preserve order on the train; if necessary, stopping the train and calling to his assistance all the train employees and such passengers as are willing to assist him. Until, at least, he has put forth the forces at his disposal, he has no right to abandon the scene of conflict. In order that conductors may be clothed with authority commensurate with their duty, they are in this State made conservators of the peace by Code, 1904, section 1294d, clause 10. In the case at bar the conductor was derelict in the discharge of his duty, and the carrier is liable.

Error to a judgment of the Circuit Court of Tazewell county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Henry & Graham* and *H. D. May,* for plaintiff in error.

*Chapman & Gillespie* and *H. N. Bell,* for defendant in error.

KEITH, P., delivered the opinion of the court.

This is an action on the case to recover damages for an injury alleged to have been inflicted upon the defendant in error while a passenger upon the train of plaintiff in error.

The original declaration contained three counts, to which the defendant filed a demurrer, which was sustained as to the first and third counts; and thereupon, by leave of the court, defendant in error amended the third count, and the trial was had in the circuit court upon the original second count and the third count as amended.

We are of opinion that these two counts sufficiently state a cause of action, and that the demurrer to them was properly overruled. The second count properly alleges the duty owed by a common carrier to its passengers; the assault upon the plaintiff by a fellow-passenger, and notice of the assault to the agents, servants and employees of the railroad company, and their negligent failure to prevent the violence and injury which the plaintiff suffered in his person. The third count alleges that the person by whom the assault was committed was himself an agent of the company. Issue was joined upon these counts, evidence was introduced, and there was a verdict and judgment against the defendant.

During the progress of the trial several bills of exceptions were taken. The first is as to the admission of certain testimony.

Defendant's counsel, on cross-examination, asked the plaintiff, Birchfield, who was testifying as a witness in his own behalf, if he had not had O'Connor, the man who was charged with having committed the assault, indicted, and whether or not he had appeared as a witness before the grand jury that indicted O'Connor. To these questions the witness answered

"yes." Thereupon the witness was asked whether or not he had appeared as a witness when O'Connor was being prosecuted on the indictment for assault, to which the plaintiff objected, and the court having asked the object of the question, counsel stated that they expected to elicit an affirmative answer to each of the foregoing questions, and could show by the witness that he had appeared as a witness against O'Connor in the criminal prosecution, and had the right to show the feeling of the witness in any manner; but the court sustained the objection of the plaintiff, and thereupon the defendant excepted.

It is competent for a party to show the bias of an adverse witness, and to prove any fact affecting his credibility before the jury. We are inclined to think that it would have been proper to permit the questions objected to, to be asked and answered; but we cannot think that under the circumstances it should be held to constitute reversible error. The whole case shows the relations between Birchfield and O'Connor; the declaration itself alleges that Birchfield, being a passenger, without provocation, was assaulted by O'Connor with a black-jack, insulted and beaten. The evidence sought to be elicited was only proper as tending to affect the credibility of Birchfield by disclosing his state of mind and feeling toward O'Connor, and we are of opinion that the record contains quite enough to enable the jury fairly to estimate and weigh the testimony of the witness Birchfield, and intelligently to determine to what extent his testimony was colored and warped by his feeling toward O'Connor, superinduced by the provocation he had received.

The second bill of exceptions is to the following question, propounded by counsel for plaintiff: "Did you hear Baldwin (meaning W. G. Baldwin, who was one of the witnesses examined for the defendant in this action) say anything about

who O'Connor was just at this time? (meaning at or about the time that the difficulty between O'Connor and Birchfield occurred)"; to which question the defendant by counsel objected, but the court overruled the objection and the witness answered that Baldwin said he didn't know who O'Connor was.

The third bill of exceptions is to the following questions asked A. R. Bowdre by the plaintiff: "Did Baldwin have hold of O'Connor when he took him out of the car? A. I didn't notice, sir. Q. What position, if any, does Baldwin occupy towards the Norfolk and Western Railway? A. I understand that he is detective for the Norfolk and Western Railway Company. Q. He is known as such all over the country? A. I think he is recognized as such. Q. He is recognized as being in the employment of the company, isn't he? A. I don't know in what capacity; all I know of his connection with the road is that he is working for them as a detective?"

The fourth bill of exceptions arises upon the motion of the defendant to strike out certain portions of plaintiff's evidence relating to what witnesses for the plaintiff had testified to with respect to certain declaraions made by O'Connor that he was an officer and agent of the Norfolk and Western Railway Company. The court refused to strike out this evidence and the defendant excepted.

As to the point raised by the second bill of exceptions, it seems to us to be wholly immaterial. It merely sets out that Baldwin had said he didn't know who O'Connor was. We do not think this answer could have affected the plaintiff in error injuriously.

As to the third bill of exceptions, we think that the questions and answers tended to prove that Baldwin was a detective at the time of the transaction inquired into, in the employment of the railway company, and that there was no error in admitting evidence tending to prove his relations with the company.

With respect to the fourth bill of exceptions, we think that, taken in connection with what appears from the fifth bill of exceptions, any error which may have been committed was corrected, so that upon the whole, taking the fourth and fifth bills of exceptions together, the plaintiff in error suffered no injury.

After the testimony was closed the defendant asked the court to instruct the jury as follows: "The court instructs the jury that as the plaintiff has charged in a count in the declaration called 'amended count for original third count,' that the defendant, by its agent, servant and employee, one James O'Connor, who was then and there employed and engaged about the business of the defendant, in the management, control and transportation of its passengers on said train as aforesaid, it then and there unlawfully, willfully and maliciously made an assault upon the said plaintiff with a certain dangerous and deadly weapon, to-wit, a black-jack, and it then and there with said weapon greatly beat, cut, bruised and wounded the said plaintiff, they cannot find for the plaintiff on this said amended count, because the court further instructs the jury that the evidence which has been produced before the jury will not support any verdict for the plaintiff founded on said amended count."

But the court refused to give said instruction as offered, and in lieu thereof gave the following instruction to the jury:

"The court instructs the jury that the court has refused to instruct them on the law arising on the third amended count in the declaration, for the reason that the evidence will not support any verdict for plaintiff founded thereon."

To which ruling and judgment of the court in refusing to give the instruction offered by the defendant and giving the instruction above recited the defendant excepted.

Leaving out of view in the instruction as asked for by plaintiff in error the recitals leading up to the conclusion, the effect

of what the court was asked to say is "that the evidence which has been produced before the jury will not support any verdict for the plaintiff founded on said amended count." This is in substance what the court said in its instruction. Now, why the court preferred the form which it adopted to that which had been presented to it by counsel for plaintiff in error is not altogether obvious to us; but the effect of the language which the court was asked to use and that which it preferred and adopted seems to us to be the same. In the one case the jury were told that the evidence produced before the jury would not support any verdict for the plaintiff founded on the amended count, and in the other case they were told that the court refused to instruct them on the law arising on the third amended count for the reason that the evidence would not support any verdict for the plaintiff founded thereon.

The sixth bill of exceptions is as follows: "After the jury had retired to their room and were considering of their verdict they returned into court, and after some colloquy between the court, the jury and counsel, which need not be more specifically stated, the jury put to the court the following question: "If the conductor regarded some passenger on the train as a special officer of the railway company, does that constitute a part of the surrounding circumstances? We are told to judge this in the light of the surrounding circumstances; and if he acted under that impression did that relieve him in any wise from the vigilance that he might have otherwise exercised?" To which the court replied: In regard to the question as to whether or not the conductor believed that a fellow-passenger was an officer, to make it more specific, and apply to this case, I will ask you to what fellow-passenger do you refer in your question?"

Juror: "We refer to Mr. O'Connor."

And thereupon the court instructed the jury as follows: "The

court instructs the jury that if they believe from the evidence that Conductor Wilburn believed, at the time of the conversation between O'Connor and Birchfield, that said O'Connor was an officer, then this is a circumstance that can be considered by the jury on the question as to whether or not the conductor had notice of the impending assault on the passenger Birchfield, and believed that he was in danger of such assault; but although he may have believed that said O'Connor was an officer, still if he had reasonable grounds to believe that said O'Connor was about to make an assault on said Birchfield, it became his duty to interfere and prevent the same if he could possibly do so."

We think that the interrogatory propounded by the juror was a perfectly natural one. O'Connor, as it appears from the evidence, had asserted at the time of the transaction under investigation that he was an agent and officer of the railroad company. The evidence fails to establish any such relation; but the conductor, as the jury thought, might, nevertheless, have been of opinion that O'Connor was what be claimed himself to be, and the jury wished to know how far that belief, if honestly entertained by the conductor, justified him in a relaxation of his vigilance. The court very properly told them that it was a circumstance which they might consider in determining whether or not the conductor had notice of the impending assault on Birchfield and believed that he was in danger of such an assault; but that it would not exonerate the conductor from the duty that he owed to Birchfield to protect him from assault while a passenger upon the train. The instruction seems to us to be favorable to the plaintiff in error, and it is certain that it could not have misled the jury to its prejudice.

The eighth bill of exceptions arises upon the motion to set aside the verdict as contrary to the law and the evidence.

The facts which the evidence tends to prove are as follows: Birchfield was upon an excursion train of the Norfolk and Western Railway, moving from the direction of Tazewell towards Bluefield. The train was a long one and two conductors were engaged in taking up the tickets, one moving from the front of the train towards the rear, and the other from the rear of the train towards the front. We cannot do better than to let Birchfield give an account of what occurred in his own language.

"I got into the first car behind the Jim Crow car; that was before the excursion cars had been attached to the train, and the train pulled up to the depot and stood there for something over an hour I suppose, and I had taken a seat in the car. When the train pulled out—a few minutes after it pulled out—I discovered a man that I knew from down in West Virginia, holding a child in his arms; the child was asleep, and I spoke to him, and told him to take my seat, and he sat down after I got up; the train was packed, and the aisles filled up pretty well. After I gave up this seat, I walked back towards the rear end of the car, and I sat down on the arm of a seat that was occupied by a young man named Johnson and a Mr. Bowdre, both traveling salesmen, whom I knew, and I turned my face towards the aisle and I asked Mr. Bowdre to give me a chew of tobacco. He said he didn't have any chewing tobacco, but that he had some smoking tobacco; and I said: 'I wonder if I can smoke in this car,' and I looked around and saw there were some eight or ten people smoking, and that some ladies had gotten into the car; so I took some of the smoking tobacco and lit my pipe, and sat down again on the arm of the seat. In a few minutes the conductor passed me—Capt. Wilburn—I knew him—and took my ticket. He didn't make any request for anybody not to smoke. He had scarcely passed me until Mr. O'Con-

nor—a man I never saw before—stepped up, and in a most abrupt manner spoke to me and said: 'Put out that pipe and quit smoking, don't you see there are ladies in the car?' I thought perhaps it was somebody that knew me and I couldn't place him. I didn't think about any serious trouble at the time, and in a half-earnest, half-humorous way, said to him: 'What have you got to do with it?' He says: 'I am a special officer of this road.' I still didn't take it seriously. When Mr. O'Connor made the statement that he was an officer of the road, I still didn't take it seriously, and I said to him: 'Where do you get your authority from?' He opened his coat, threw back his coat in this manner (illustrating) and showed me a pistol that he was carrying in a scabbard; I realized instantly that I was possibly up against some sort of trouble, and my first idea was to draw the conductor into it. He was taking up tickets ahead, and he hadn't gone over two or three seats past me. I said: 'Suppose we ask the conductor about this,' and I held up the pipe and called to him and said: 'Captain, is smoking prohibited in this car?' His answer was: 'There are some ladies in the car.' I said: 'I will just quit, then, and knocked the ashes and tobacco out of my pipe on the arm of the seat. I supposed that ended it, when Mr. O'Connor said: 'I asked you as a gentleman to quit smoking and if you had been a gentleman you would have quit when I told you to quit.' I said: 'That matter is all over now, and you have nothing further to do with it.' I was still standing up with the pipe in my hand, and he said to me: 'Put that pipe in your pocket,' and grabbed at the pipe; and I said: 'No, that is my pipe.' He then repeated what he said about if I had been a gentleman I would have quit when he asked me to quit; and I said to him: 'I am a gentleman,' and he didn't make any motion as if to strike me then, and I took my eye off of him for a moment or two, and

the next instant he struck me with this black-jack. I felt the lick and heard a woman scream at the same time. There was an interval of time that I didn't know what took place. Mr. Baldwin was several seats in front of me; I had noticed him in the car before that; and when I come too Mr. Baldwin was between me and Mr. O'Connor, and Mr. O'Connor again struck at me with this black-jack over Mr. Baldwin's shoulder. That is when I first really saw the black-jack, and Mr. Baldwin seemed to take charge of Mr. O'Connor and started towards the front of the car with him. By that time the blood was all over my face and down on my collar and shirt, and when Mr. Baldwin started out of the car, my first idea was to get Mr. O'Connor's name—I didn't know him; and I said: 'Hold on, I want this man's name,' and I asked two or three times, and Mr. O'Connor turned around to me and said: 'My name is John Wallace; I can be reached at Vivian, West Virginia, by 'phone, letter or wire'; and he passed on out with Mr. Baldwin, and I supposed under arrest, because I knew Mr. Baldwin was an officer of the road."

There was evidence which tends to show that the altercation between O'Connor and Birchfield was in quite a loud tone of voice, loud enough to warrant the jury in the inference that it must have been heard by the conductor, or that it might have been heard by him had be been attentive to his duties. It was heard by Baldwin, who came to the rescue of Birchfield, and by a number of passengers who testified in the case. One witness testified that he was seated near the center of the car, and that Birchfield was a few seats from the rear end; that the conductor, at the beginning of the trouble, was between him and Birchfield; and that when O'Connor said to Birchfield, in a menacing tone, that if he had been a gentleman he would have put out the pipe when he was first spoken to, the conductor had

about got up to witness' position in the train—that is to say, was about the middle of the car, and in the opinion of the wit-ness, could have heard the statement made by O'Connor to Birchfield.

The testimony of Baldwin is about as follows: That he was sitting in the front seat on the right-hand side going toward Bluefield, and at the end of the car, which was very much crowded; that just after leaving Tip Top station his attention was directed to some gentleman shouting in a loud tone: "I am a gentleman"; that the gentleman was sitting on the arm of the seat facing the aisle; that he turned and saw a commotion in the rear of the car a little back of the center; that he imme-diately ran back and saw O'Connor hit Birchfield; that he struck him two licks before he got to them; that he ran between them, shoved Birchfield back toward the front of the car and said to O'Connor: "Don't strike that man, I know him, he is a gentleman"; that he took hold of O'Connor and took him out to the front end of the car, out on the platform. When asked if he saw the conductor on the car he replied that he saw the conductor but did not know at the time that he was the con-ductor, because the train was in charge of Conductor McCul-lough; that he saw this man taking up tickets, but thought he was a brakeman and did not know he was a conductor until afterwards; that the man's name was Wilburn; that he didn't think he had a conductor's cap on at the time, but he may have had; that his impression was he was simply a brakeman; that he passed him within one or two seats of the front of the car; and that before he could get to Birchfield two of the licks were struck, and Conductor Wilburn followed him back to Birchfield.

It appears that the conversation was in a tone so loud that its very beginning arrested the attention of Baldwin, who was

seated at the extreme front of the car, and who in hastening back to put a stop to the trouble passed the conductor on his way and was followed by him to the scene of the difficulty.

We think that the whole tendency of the evidence is to show that the conductor must have heard the altercation, and that it was of a character that should have warned him that it was his duty to interpose.

As was said by this court in *Connell* v. *Chesapeake and Ohio Ry. Co.,* 93 Va. 55, 24 S. E. 468, 32 L. R. A. 792, 57 Am. St. Rep. 786, reaffirming the law as stated in *Farish & Co.* v. *Reigle,* 11 Gratt. 697, 62 Am. Dec. 666: "Railways engaged as carriers of passengers, while not insurers against all injuries except by the act of God or of public enemies, as are the carriers of goods, are yet bound to carry safely those whom they take into their coaches in so far as human care and foresight can provide; that is to say, are bound to use the utmost care and diligence of very cautious persons; and they will be held liable for the slightest negligence which human care, skill and foresight could have foreseen and guarded against."

In *Pittsburg R. Co.* v. *Hinds,* 91 Am. Dec. 227, it is said that the official character and position of a conductor are a power. "He may stop the train and call to his assistance the engineer, the fireman, all the brakemen, and such passengers as are willing to lend a helping hand; and it must be a very formidable mob, indeed—more formidable than we have reason to believe had obtruded into these cars—that can resist such a force. Until at least he has put forth the forces at his disposal, no conductor has the right to abandon the scene of conflict. To keep his train in motion and busy himself with collecting fares in forward cars whilst a general fight was raging in the rearmost car, where the lady passengers had been placed, was to fall far short of his duty."

"As to passengers, the contract of carriage imposes upon the carrier the duty not only to carry safely and expeditiously between the termini of the route embraced in the contract, but also the duty to conserve by every reasonable means their convenience, comfort and peace throughout the journey. And this same duty is, of course, upon the carrier's agents. They are under the duty of protecting each passenger from avoidable discomfort, and from insult, from indignities, and from personal violence." *Birmingham Ry. Co.* v. *Baird* (Ala.), 30 So. 459, 89 Am. St. Rep. 44.

"The general rule is that the carrier is bound to use and exercise the utmost skill and care of a prudent man in taking precautions to prevent one passenger from being injured by the ignorant, negligent or reckless acts of another." *Simmons* v. *New Bedford, &c., Co.,* 97 Mass. 369, 93 Am. Dec. 99.

In *Spangler* v. *St. Joseph Ry. Co.* (Kan.), 74 Pac. 608, 63 L. R. A. 634, 104 Am. St. Rep. 395, it is said that "Although the doctrine is of comparatively recent growth, it is now firmly established that a carrier of passengers must exercise the same high degree of care to protect them from the wrongful acts of their fellow-passengers, or of strangers, that is required for the prevention of casualties in the management and operation of its trains, namely, the utmost care, vigilance and precaution, consistent with the mode of conveyance and with its practical operation."

In *United Railways, &c., Co.* v. *Deane* (Md.), 49 Atl. 925, 54 L. R. A. 942, 86 Am. St. Rep. 458, it is said: "If there is danger of any one being injured, and the employees fail to remove, subdue or overpower the turbulent individual after knowing that there is danger, or after they ought to have known that there was danger if they exercised proper care, that fail-

ure is negligence, for the consequences of which the company is answerable."

In order that conductors may be clothed with authority commensurate with their duty, it is provided by clause 10 of section 1294d, Va. Code 1904, that "Conductors of railroad trains and station and depot agents shall be conservators of the peace, and they and each of them shall have the same power to make arrests that justices have, except that the conductors shall only have such power on board their respective trains and on the property of their company while on duty, and the agents at their respective places of business, and the said conductors and agents may cause any person so arrested by them to be detained, and delivered to the proper authorities for trial as soon as practicable."

We are of opinion that there is no error in the record for which the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*