DR. GEORGE D. HENNING, ET AL.

V.

LELIA E. THOMAS

Record No. 850120

March 4, 1988

Present: All the Justices

*S. D. Roberts Moore (W. Charles Waddell, III; Gentry, Locke, Rakes & Moore*, on brief), for appellants.

*Robert W. Mann (R. Reid Young, Jr.; Young, Haskins, Mann, Gregory & Young, P.C.*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This is an appeal from a decision in a medical malpractice case. Lelia E. Thomas sued Dr. George D. Henning and Dr. Robert S. Pruner, both orthopedic surgeons, alleging that their negligent failure to diagnose a certain ailment resulted in the paralysis of her right leg below the knee. The jury returned a verdict of $150,000 in favor of Thomas, on which judgment was entered. In their appeal, the doctors contend that the trial court erred in the following three particulars:

1.  in permitting testimony of an expert witness who was unfamiliar with the standard of care in Virginia;
2.  in limiting cross-examination of plaintiff's expert even though the cross-examination was intended to show the witness' bias; and
3.  in permitting plaintiff to use the deposition testimony of another physician to rebut portions of the defendant's case.

Because we conclude that the trial court erred in limiting cross-examination on the question of bias, we will reverse the judgment and remand the case for a new trial. Further, because the case will be remanded, we find it necessary to address all of the issues raised by the doctors.

Thomas, then 69 years old, was admitted to the hospital on July 4, 1979, for a meniscectomy (the removal of torn knee cartilage). Dr. Henning performed the surgery on July 5, 1979. He was assisted by Dr. Christopher S. Wilson, then a resident in orthopedic surgery at the University of Virginia Hospital. The surgery was uneventful. Dr. Henning went on vacation on July 7 and turned the case over to Dr. Pruner. On July 8, 1979, Dr. Pruner noted that Thomas' right foot had dropped, that is, her foot was hanging down and she was unable to raise it up. This indicated damage to her peroneal nerve. The patient complained of pain and was unable to perform prescribed physical therapy exercises. The patient's knee was swollen, and there was a bruised area behind the knee (a condition known as ecchymosis). On July 10, Thomas' hematocrit (red blood) count dropped from 37 to 30 which suggested either the loss of two pints of blood or the dilution of her blood by other fluids. The patient continued in pain. She also complained of tenderness in her right calf. A venogram (an x-ray of the veins), indicated deep vein blood clots. She was treated with anticoagulants.

On July 28, the patient rolled over in bed and experienced a sharp pain in her right knee. Upon examination, a pulsating mass the size of a small fist was found behind her knee. A vascular surgeon was called; he found what he described as a ruptured aneurysm. He repaired the artery. Thomas proved at trial that her right leg is permanently paralyzed below the knee.

## I.

In order to prove her claim of malpractice, Thomas called Dr. Thomas S. Culley as an expert witness to establish the standard of care in such cases in Virginia. His qualifications were challenged by the defendants. The trial court considered the evidence of his qualifications out of the jury's presence.

Culley testified that he was Medical Director for Aetna Life and Casualty Insurance Company. He attended college in Mississippi and graduated from Vanderbilt University Medical School in 1953. He completed his residency in orthopedics at Vanderbilt in 1960. He became a board certified orthopedic surgeon in 1963. Thereafter, he was a professor of medicine at the University of Missouri from 1965 until 1983. He testified to membership in the American Academy of Orthopedic Surgeons and the Clinical Orthopedic Society.

Culley testified that over the course of his career he attended meetings and seminars on the subject of knee surgery where various Virginia orthopedic surgeons were also present. He stated that one of the professors of orthopedic surgery at the Medical College of Virginia had been one of his residents when Culley was at Vanderbilt. He further testified that he subscribes to and reads the *Journal of Bone and Joint Surgery*, which he described as the standard reference journal for the specialty. He said that there are no state medical specialty journals. For example, according to Culley, there is no "Virginia Journal of Orthopedic Surgery." He testified that, as a professor, he taught orthopedic surgery to students who might start their practice in any state in the union and that, as far as he was aware, no state had any additional or special requirements as a prerequisite to practicing orthopedic surgery.

According to Culley, the standards of practice in orthopedic surgery apply everywhere. Moreover, according to him, the requirements that must be fulfilled to receive board certification are much more stringent than any state licensing requirement. He

said that, to his knowledge, there were no state standards in orthopedics that would be contrary to national standards.

Culley also testified that in preparing for trial he had reviewed the depositions of Drs. Henning, Prunner, and Wilson. He also had read the deposition of and talked personally with Dr. Richard H. Fisher, an orthopedic surgeon who practiced in the Roanoke area. Culley testified that in his reading he did not see anything that would indicate a standard of care in Virginia which differed from the standard of care elsewhere. In particular, Culley said that he agreed with Dr. Wilson, a Virginia-trained physician, who stated in his deposition that the techniques of orthopedic surgery are basically the same nationwide. Culley also agreed with Dr. Wilson's view that the recognition of the problem which allegedly had paralyzed Mrs. Thomas was basically the same everywhere. Moreover, Culley testified that when he discussed the case with Dr. Fisher they both analyzed the problem in the identical manner.

On cross examination, Culley admitted that he had never practiced orthopedic surgery in Virginia, that no Virginia patient had ever been transferred to him, that he had given no lectures in Virginia, and that he had not treated Thomas. Nevertheless, Culley concluded, based on all the items mentioned in his direct testimony, that he knew the standard of care of a reasonably prudent orthopedic surgeon practicing in Virginia. The trial court agreed and found him qualified to testify.

Code § 8.01-581.20 concerns the standard of care and expert testimony in a medical malpractice case; it provides in pertinent part as follows:

[I]n any action against a physician . . . to recover damages alleged to have been caused by medical malpractice where the acts or omissions so complained of are alleged to have occurred in this Commonwealth, *the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably, prudent practitioner in the field of practice or specialty in this Commonwealth* and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted . . . . *An expert witness who is familiar* with the statewide standard of care *shall not have his testimony excluded*

*on the ground that he does not practice in this Commonwealth.*

(Emphasis added.) The predecessor to this statute, which changed the standard of care from a local standard to a statewide standard, was enacted following this Court's decision in *Bly* v. *Rhoads*, 216 Va. 645, 222 S.E.2d 783 (1976). In *Bly*, we declined to adopt a nationwide standard of care on the ground that it was a question for the legislature. Thus, Code § 8.01-581.20 and its predecessor are doubly significant: they adopt a statewide standard and implicitly reject a national standard.

■ In light of the statutory language, in order for a doctor to qualify as an expert witness in Virginia, in a case of this kind, he must show that he is "familiar" with the Virginia standard of care. In *Grubb* v. *Hocker*, 229 Va. 172, 326 S.E.2d 698 (1985), we pointed out, in essence, that there is no rigid formula to determine the knowledge or familiarity of a proffered expert concerning the Virginia standard of care. Instead, that knowledge may derive from study, experience, or both. *Id.* at 176, 326 S.E.2d at 700-01.

■ Because the question of Dr. Culley's qualification as an expert comes to us on appeal, it must be noted that the question whether an expert is qualified rests largely within the sound discretion of the trial court. *Id.* at 176, 326 S.E.2d at 700; *Maxwell* v. *McCaffrey*, 219 Va. 909, 912, 252 S.E.2d 342, 344 (1979); *Noll* v. *Rahal*, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). Further, as we stated in *Harkins* v. *Reynolds Associates*, 221 Va. 1128, 1130, 277 S.E.2d 222, 223 (1981), "a trial court should not be reversed for permitting a witness to testify as an expert *unless it clearly appears* that he was not qualified in the field in which he tendered his evidence." (Citations omitted) (emphasis in original).

Although, if called upon to decide this issue, another trial court or members of this Court may have ruled Culley unqualified to testify, it does not clearly appear that Culley was *not* qualified to testify as an expert. *Cf. Noll* v. *Rahal*, 219 Va. at 801, 250 S.E.2d at 745. He read the deposition of, and discussed the case with, Dr. Fisher, a Virginia orthopedic surgeon, and both men analyzed the case identically. He considered the deposition of Dr. Wilson, who studied and practices in Virginia, and agreed with Dr. Wilson that the techniques of orthopedic surgery and the recognition of the

particular medical problem in question were basically the same in Virginia as elsewhere. Finally, he reviewed the depositions of the two other Virginia doctors who had treated the patient and was thus able to observe how they had approached the case. Given the evidence on this issue, we hold that the trial court did not err in finding Dr. Culley qualified to testify as an expert.

## II.

The second issue also concerns Dr. Culley. Defense counsel sought to ask Culley how he became involved in the case. The trial court would not permit any question other than whether Dr. Culley was being paid to come to court to give his testimony.

The defendants made a question-and-answer proffer of what they intended to elicit from Dr. Culley. In the proffer, Culley testified that he learned of the case from a Dr. Charow, a New York physician who runs a company called Professional Medical Witnesses, Inc. That company identifies other physicians throughout the country who are willing to review medical records and provide medical testimony. Dr. Charow advertises his services in legal and other publications throughout the United States. Culley signed an agreement with Dr. Charow to review cases. Culley was to receive a fee of $200 for reviewing depositions or transcripts. He was to receive another fee for testifying but said he did not know what his fee was for the instant case because the fee was charged by Dr. Charow, who in turn paid Culley. Culley said he was to be paid his fee regardless of the outcome of the trial. Culley's expenses were paid directly by plaintiff. Dr. Charow also was to receive a fee.

When the trial resumed, the jury heard a very brief exchange based on the only question permitted by the trial court. Question: "You have been paid to come here." Culley gave this reply: "Yes. So have you."

■ The defendants argue that they were precluded from exploring the relationship among Professional Medical Witnesses, Inc., Dr. Charow, Dr. Culley, and the plaintiff. They contend that they sought to establish bias, prejudice, or relationship. They submit that questions on these points are never collateral and that they had a right to bring to the jury's attention the information set forth in their proffer. We agree.

In *Henson v. Commonwealth*, 165 Va. 821, 183 S.E. 435 (1936), a criminal case involving manslaughter, the defendant ar-

gued that a certain witness should not have been allowed to testify that defendant's alibi witness had previously attempted to help the same defendant in another criminal case by purchasing a ticket to send a key witness away on a trip. Defendant argued that such testimony was collateral. We disagreed. We wrote as follows:

> *The bias of a witness, like prejudice and relationship, is not a collateral matter.* The bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness . . . . [O]n cross-examination great latitude is allowed and . . . the general rule is that *anything tending to show the bias on the part of a witness may be drawn out.*

*Id.* at 825-26, 183 S.E. at 437 (emphasis added). *See also Norfolk & Western Railway Co. v. Birchfield*, 105 Va. 809, 812, 54 S.E. 879, 880 (1906) (repeating the general rule but concluding under the circumstances of that case that it was harmless error not to permit a particular question because the information sought by the questioner was developed by other evidence).

The plaintiff argues that it was within the trial court's sound discretion to limit cross examination as it did. Plaintiff contends that the trial court's ruling shows that Dr. Culley impressed the court "with his having come to an honest conclusion, satisfactory to himself . . . ." According to plaintiff, in Culley's lengthy qualification testimony — which, it must be noted, the jury properly did not hear — "there was no intimation whatsoever that he did anything other than honestly and objectively evaluate Mrs. Thomas' claim." Finally, plaintiff makes this point:

> It is respectfully submitted that it was the obvious intent and sole purpose of this proposed line of questioning for the jury to draw some adverse, clandestine inference from Dr. Culley's perfectly proper association with Dr. Charow and Professional Medical Witnesses.

Our response can be summed up in one word: "Precisely." The trial court's ruling prevented defendants from doing precisely what defendants had a right to do. The defendant doctors were entitled to attempt to persuade the jury that Dr. Culley was a "doctor for hire," who was part of a nationwide group that offered themselves as witnesses, on behalf of medical malpractice plain-

tiffs. Once the jury was made aware of this information it was for the jury to decide what weight, if any, to give to Culley's testimony. This was a classic case of an effort to establish bias, prejudice, or relationship.

■ The trial court went too far when it limited defendants' cross examination to the bare question whether Dr. Culley was being paid to testify. And, unlike what happened in *Norfolk & Western* v. *Birchfield*, the improper limitation of questioning in this case was not made harmless by the development, through other sources, of the information that related to bias, prejudice, or relationship. We hold that it was reversible error to limit defendants' cross-examination on this issue to this extent.

### III.

After the defendants rested, plaintiff sought to use the deposition testimony of Dr. Richard Fisher in rebuttal. The defendants objected on the ground that the proposed testimony was not rebuttal but simply a repetition of the testimony offered in plaintiff's case-in-chief. Defendants' counsel said that plaintiff was attempting to "get the last word." A further objection was made on the ground that the deposition did not show that Dr. Fisher was an expert or that he was familiar with the standard of care in Virginia. The testimony was also objected to on the ground that Dr. Fisher never gave a proper opinion of a deviation from the standard of care. Moreover, defendants argued that the deposition could not be used because Dr. Fisher was available in the jurisdiction to testify in person and had not actually examined or treated the plaintiff.

Plaintiff's counsel argued that Dr. Fisher's testimony rebutted testimony from both defendants and from Dr. Wilson that there was no indication in the record of the existence of the medical phenomenon known as closed compartment syndrome.* The trial court permitted the testimony.

■ The question whether or not to admit certain evidence during rebuttal is generally left to the sound discretion of the trial

---

* The main dispute in the case was whether closed compartment syndrome existed and when it should have been recognized by the defendants. In closed compartment syndrome, a build up of pressure in a closed, inelastic space results in damage to the tissues located within the closed compartment. In this case, the testimony was that the peroneal nerve passed through such a compartment.

court. *Virginian Railway* v. *London*, 148 Va. 699, 716, 139 S.E. 328, 333 (1927). Here, there was no abuse of that discretion.

Rule 4:7(a)(4)(E) of the rules of this Court provides, in pertinent part, as follows:

> The deposition of a witness, whether or not a party, *may be used by any party for any purpose in any action* at law . . . if the court finds: . . . (E) that the witness is a . . . physician, surgeon, dentist, or registered nurse who, in the regular course of his profession, treated or examined any party to the proceeding . . . provided, however, that if the deponent is subject to the jurisdiction of the court, the court may upon a showing of good cause or sua sponte, order him to attend and to testify ore tenus.

(Emphasis added.) Fisher testified at the beginning of his deposition that Thomas came to him in June 1981 complaining about her right leg, of bunions, and of hammertoe. He examined her concerning those matters. We conclude, therefore, that because Dr. Fisher examined plaintiff in the regular course of his profession, plaintiff was entitled to use Fisher's deposition for any purpose, including rebuttal, if the trial court deemed this use appropriate.

As indicated, the central dispute was whether plaintiff had developed closed compartment syndrome, and when her doctors should have recognized the existence of this syndrome. Dr. Culley testified that, from his review of the medical records, at least by July 10, all the signs were in place to indicate the existence of the syndrome and plaintiff's doctors should have recognized the same by that day if not sooner. Dr. Henning, Dr. Prunner, and Dr. Wilson each said that there were no indications of closed compartment syndrome in the course of plaintiff's treatment. Plaintiff sought to rebut these comments by Dr. Fisher's testimony.

First, Fisher made clear at the beginning of his testimony that he was an orthopedic surgeon practicing in Virginia, in the Roanoke area. This means that defendants' argument that there was no showing that he was a qualified expert is plainly wrong. Next, Fisher clearly stated that, from the medical record, closed compartment syndrome had to be considered. Thus, his testimony directly answered the contention raised by the defendants that there was no evidence of the disputed syndrome.

Further, defendants' concern that Fisher did not give a formal opinion as to whether they had violated the standard of care in not recognizing the existence of the syndrome misses the point of the rebuttal. Fisher scrupulously avoided saying whether he thought the defendants fell below the appropriate standard of care. But all plaintiff wanted to show was that an expert in orthopedics, from Roanoke, saw evidence from the medical records of closed compartment syndrome. This could be done and was done by Fisher without his having to state that the defendants were negligent in their treatment of the plaintiff.

■ Finally, defendants contend that Fisher's deposition testimony should not have been used because Fisher was available in the jurisdiction to give his testimony in person. There are two reasons this argument is unavailing for the defendants. First, Rule 4:7(a)(4)(E) does not make lack of availability a prerequisite for the use of a deposition of a treating or examining physician. Second, the last phrase of the rule quoted above provides a mechanism for determining when in-person testimony will be required. The defendants never sought to avail themselves of this mechanism. Consequently, they cannot now complain that Dr. Fisher was not compelled to give his testimony in person.

In our opinion, the trial court was justified in admitting Dr. Fisher's testimony in rebuttal. We hold, therefore, that it did not err in so doing.

## IV.

Because the trial court erred in limiting cross-examination of plaintiff's expert witness, we will reverse the judgment of the trial court and remand the case for a new trial consistent with this opinion.

*Reversed and remanded.*

RUSSELL, J., dissenting in part.

I agree that the judgment should be reversed because of the trial court's limitation of the defendant's right to cross-examine Dr. Culley on the issue of bias, but I do not think Dr. Culley established sufficient familiarity with the applicable statewide standard of care to qualify as an expert witness in the first place.

Dr. Culley had practiced orthopedic surgery in Missouri and had taught medicine in Missouri and in Tennessee. He had discontinued both practice and teaching at the time of trial, and was then employed by a life insurance company in Connecticut. He could demonstrate no study, training, or experience which would have established the slightest familiarity with the standard of care prevailing in Virginia.

The majority opinion concludes that the trial court acted within its discretion in qualifying Dr. Culley because Dr. Wilson, a Virginia practitioner who did *not* testify that the Virginia standard was violated in this case, had opined in a deposition that certain techniques and diagnostic practices were "basically the same in Virginia as elsewhere." Dr. Culley expressed a similar opinion. In my view, those attempts to lay a foundation fell far short of establishing Dr. Culley's familiarity with the statewide standard required by Code § 8.01-581.20.

In *Bly* v. *Rhoads*, 216 Va. 645, 222 S.E.2d 783 (1976), we were asked to abandon the long-established "similar local community" standard and to adopt a national standard for the qualification of expert witnesses in medical malpractice cases. Although we noted the strong arguments made for the adoption of a national standard, we declined to do so by judicial fiat. We held that such a fundamental change in the law should be made, if at all, by the General Assembly. 216 Va. at 652-53, 222 S.E.2d at 789.

The legislature responded in 1979, as the majority notes, by the adoption of Code § 8.01-581.20 after thorough study and debate. The legislative decision was not to adopt a national standard, but rather to substitute a statewide standard unless the trial court found from the evidence that a local community standard was more appropriate in a particular case. The General Assembly has since had many opportunities to adopt a national standard, but has continually declined to do so.

Here, the majority opinion has approved an exercise of judicial discretion which effectively substitutes a national standard in lieu of the scheme adopted by the General Assembly. I do not think judicial discretion extends so far. The majority would permit trial courts, in their discretion, to qualify so-called experts who have no familiarity whatever with the standards of professional care prevailing in Virginia, provided a Virginia practitioner can be found who will express the opinion that the Virginia standard is the same as standards prevailing nationwide.

A major weakness in the majority's reasoning is the dubious quality of such an opinion. A Virginia practitioner can hardly be expected to have familiarity with the standards prevailing throughout each of the other 49 states, including both their urban and rural areas. I doubt that such an omniscient physician exists. His opinion of nationwide uniformity has no more value than that of the imported "expert" who, although having no knowledge of the standards prevailing in Virginia, is nevertheless fully prepared to testify that they were violated. Another weakness in the majority's conclusion is that the General Assembly has directly rejected the same result.

Since the majority opinion leaves the qualification of expert witnesses having no familiarity with Virginia standards within the discretion of our circuit courts, it is to be hoped that they will continue to exercise the degree of judicial restraint we exercised in *Bly* v. *Rhoads*, and leave the adoption of a nationwide standard to the General Assembly.