## CIRCUIT COURT OF THE CITY OF NORFOLK

Wade Lovelace,
Adm'r of the Estate of
Mary Catherine Lovelace

v.

Maria R. Urbano
and Douglas Johnstone

May 26, 1995

Case No. (Law) L91-1800

BY JUDGE JOHN C. MORRISON, JR.

This matter is pending on motions to set aside the jury verdict filed by Defendants Maria R. Urbano, M.D., and Douglas Johnstone, L.C.S.W., and to award judgment to the same. Defendants' motions follow a jury verdict rendered on September 20, 1994, in favor of Plaintiff Wade Lovelace, Administrator of the Estate of Mary Catherine Lovelace.

The relevant facts follow. On February 8, 1988, Mary Katherine Lovelace (hereinafter referred to as "Mary") voluntarily checked into the Women's Treatment Center of the Medical College of Hampton Roads ("the Hospital") complaining of depression. Dr. Urbano, a psychiatrist representing the Hospital, was designated as Mary's attending physician. Dr. Urbano diagnosed Mary as having major depression, single episode, with alcohol abuse.

Upon Mary's admittance, she was evaluated by a medical student. The evaluation was subsequently approved by Dr. Urbano as sufficient. Dr. Urbano ultimately learned from the patient that she was a Navy wife and mother living in Norfolk, Virginia, and that she was subject to multiple psychological stressors prior to her admission. These stressors included being the sole caretaker of three pre-school children, having a husband stationed on a ship in Philadelphia who only came home three weekends

out of four, having no network of friends, and having marital problems. Dr. Urbano also learned that Mary had planned to become intoxicated and shoot herself in the head with her husband's revolver and that on one occasion, the patient had taken the gun and fired it into the ground.

Additionally, when Mary entered the hospital, she expressed reluctance to taking antidepressant medications. Noting the patient's concerns, Dr. Urbano did not prescribe any such medications. Instead, she instructed Mr. Johnstone, a Licensed Clinical Social Worker ("LCSW") and member of the treatment team, to commence psycho- and family-therapy with the patient. The hospital records indicated that Dr. Urbano never attempted to educate Mary about the nature of her disease, the benefits of taking anti-depressant medication, or the potential danger of not taking such medica-tion. Moreover, there is no evidence that the treatment team was directed to, or actually did, communicate such information. Accordingly, Mary was treated solely with psychotherapy administered by Mr. Johnstone while an in-patient under the care of Dr. Urbano.

During her twenty-one days of hospitalization, Dr. Urbano saw Mary in private meetings on five occasions. In addition, Mary underwent extensive psychological testing by Eric A. Zillmer, Psy. D., also a member of the treatment team. Mr. Zillmer prepared a full report in which he described Mary as being a suicide risk. He also noted that the patient was a "smiling depressive." Such individuals, according to the report, deny their emo-tions, repress strong emotions, and are unable to express feelings directly. Both Dr. Urbano and Mr. Johnstone read the Zillmer report.

Approximately two weeks after Mary was admitted to the hospital, she was scheduled to be released. The patient's release was postponed, how-ever, when she began to have pseudoseizures. Nevertheless, on March 1, 1988, one week after the pseudoseizures began and three weeks after her admittance into the hospital, Mary was discharged and sent home. She was released from the care of Dr. Urbano and placed under the sole care of Mr. Johnstone, who was to continue psycho- and family-therapy.

On the date of Mary's release, she was, to some extent, eating better, sleeping better, and had gained back some weight that she had lost as a result of her disease. Also, her husband had removed his gun from the house. Nonetheless, Mary still suffered from major depression, single epi-sode, and was not on antidepressant medications. The social stresses that apparently contributed to her condition were still present at home.

On March 17, 1988, in an individual therapy session with Mr. John-stone, Mary spoke of a possible suicide by her uncle; that she was afraid

and nervous about attending the Adult Children of Alcoholics Program; that she faced life from a negative stance; and that her husband's gun was back in the house. Mr. Johnstone indicated in the Progress Notes that he was very concerned about the gun being back in the house. He observed that the gun in the house was very dangerous for Mary and the children in light of the patient's past experience with the gun. Although Mr. Johnstone insisted that Mary get the gun out of the house, he never took active measures to have the gun removed. In fact, according to his records, no mention of the gun was made at any of the following individual or family therapy sessions.

In the individual therapy session with Mr. Johnstone on March 21, 1988, Mary again mentioned suicide with regard to her uncle. On March 24, 1988, in another individual therapy session, Mary told Mr. Johnstone that she was feeling depressed, was alone too often, and that she needed intellectual stimulation. Also in that session, she started writing a story about another woman and suicide. Mr. Johnstone did not perform a suicide risk assessment, a test used for intervention and prevention purposes.

Mary cancelled her next therapy session with Mr. Johnstone, which was scheduled on March 25, 1988. She then cancelled a second therapy session scheduled for 1:00 p.m. on March 31, 1988, by leaving a telephone message at 10:30 a.m. that morning. Mr. Johnstone got the message that morning and subsequently consulted with Dr. Urbano. Both doctors agreed that cancellation of two consecutive appointments by a patient is a reason for concern and that Mr. Johnstone should call and check on Mary's condition. Mr. Johnstone never called Mary on March 31, 1988. On that same day, Mary shot herself in the head with her husband's revolver. The injuries were fatal.

Pursuant to the above facts, Plaintiff initiated a medical malpractice action against both Dr. Urbano and Mr. Johnstone, alleging various breaches of the appropriate standards of care by each Defendant. After a four-week trial, the jury returned a verdict for the Plaintiff in the amount of $2 million. Defendants moved pursuant to § 8.01-430 of the Code of Virginia to have this Court set aside the jury verdict and enter judgment for Defendants. Both Defendants contend that the evidence supporting the jury's verdict is insufficient as a matter of law and that the jury could not have properly found: (1) that Plaintiff was of unsound mind at the time that she took her own life; (2) that Defendants could have foreseen that their negligent acts and omissions would proximately cause Mary's suicide; and (3) that their acts and omissions proximately resulted in Mary's

death. In addition, counsel for Mr. Johnstone challenges the Court's determination that Dr. Michael Kaminsky qualified to testify as an expert witness against Mr. Johnstone.

## I. *The Qualification of Dr. Kaminsky as an Expert*

In medical malpractice actions in Virginia, the standard of care by which the doctor's "acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." Va. Code § 8.01-581.20 (Michie 1950). Any out-of-state physician who qualifies for a license to practice in Virginia is presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified. *Id.* Moreover, "[a]n expert witness who is *familiar* with the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this Commonwealth." *Id.* Counsel for Mr. Johnstone contends that Dr. Kaminsky failed to qualify as an expert in Virginia on the applicable standard of care for LCSWs. Defendant does not contest that Dr. Kaminsky is qualified for licensure in Virginia and receives the benefit of § 8.01-581.20's presumption. However, Defendant claims that he has demonstrated that Dr. Kaminsky is unfamiliar with the standard of care and has, therefore, overcome that presumption.

Dr. Kaminsky's testimony revealed that he graduated *cum laude* and received a Bachelor of Arts degree from Yale University in 1967. He obtained his Doctorate in Psychiatry from Cornell University in 1972. He completed his rotation requirement at Denver General Hospital from 1972 to 1973. He performed his residency at the University of Oregon's Health Services Clinic from 1973 to 1976. He has been an instructor in the Department of Psychiatry at the Johns Hopkins Hospital in Baltimore, Maryland, from 1976 to the present. He was a consultant to a private clinic in Gaithersburg, Maryland, from 1978 to 1981. He was director of the psychiatric emergency room at Johns Hopkins from 1976 to 1994 and also headed a community psychiatric program at Johns Hopkins. Additionally, Dr. Kaminsky is licensed to practice psychiatry in Maryland and is qualified for licensure in Virginia.

Dr. Kaminsky testified that he is familiar with the standard of care applicable to psychiatrists and licensed clinical social workers in Virginia for the treatment of major depression, single episode with alcohol abuse. He also testified that he is familiar with the Therapeutic Community Model of treatment, otherwise known as the Community Health Team

Treatment approach. The facts which support Dr. Kaminsky's testimony are as follows. Johns Hopkins, where Dr. Kaminsky practices, is located in Maryland, which is a neighboring state of Virginia. Additionally, Johns Hopkins is a tertiary referral site for depression patients who reside in Virginia. Dr. Kaminsky has reviewed many patient referrals, as well as medical charts and records of patients from Virginia. Many faculty members with whom Dr. Kaminsky works at Johns Hopkins have practices and are licensed in Virginia. Dr. Kaminsky has discussed Virginia's standard of care and preferred treatment models with those faculty members. He has also treated Virginia patients in collaboration with Virginia-licensed psychiatrists. He continues to maintain relationships with many Virginia-based psychiatrists and has occasion to discuss his profession with Virginia doctors who have worked with Virginia LCSWs.

Related specifically to the case at bar, Dr. Kaminsky collaborated with Dr. Lee Vliet and Dr. Tom Wise, both Virginia psychiatrists, on the treatment of patients with major depression with alcohol abuse.[1] Also, he worked with many Virginia-licensed social workers at the clinic in Gaithersburg, Maryland, and observed their standard of care as related to their level of psychiatric treatment. Lastly, Dr. Kaminsky testified that the standard of care for psychiatrists and LCSW's is the same in Maryland as it is in Virginia.

Defendant avers that the above testimony demonstrates Dr. Kaminsky's lack of familiarity with the standard of care applicable to Mr. Johnstone. In support, Defendant points out that the doctor could not specifically name a particular Virginia LCSW with whom he spoke distinctly about the standard of care applicable to a LCSW in Virginia in 1988 treating a patient with major depression, single episode, with alcohol abuse using the Therapeutic Community Model of treatment. As noted above, the statutory criteria with which a physician must comply to testify as an expert in Virginia is one of familiarity and is protected by a statutory presumption. Defendant attempts to overcome this presumption by imposing a stricter standard. The Court cannot accept that argument.

The Supreme Court of Virginia has held that the trial court must simply find that an expert was familiar with the standard of care in the particular field in question. *Grubb v. Hocker*, 229 Va. 172, 176 (1985) (a doctor, previously licensed in Virginia, maintained familiarity with Virginia's

---

[1] Any conversations between Dr. Kaminsky and Dr. Vliet that occurred subsequent to the deposition of Dr. Kaminsky were disregarded in making the Court's decision.

standard of care by maintaining contacts with Virginia doctors and attending lectures by Virginia doctors and was therefore qualified as an expert witness). Such knowledge may be acquired through study, experience, or both. *Id.* Dr. Kaminsky's competence to testify as an expert under these guidelines was amply revealed on voir dire.

Whether a witness is qualified to express an opinion as an expert is a question largely within the discretion of the trial court. *Henning v. Thomas*, 235 Va. 181, 186-87 (1988) (appellate court would not reverse trial court's decision that witness was qualified as an expert where witness had discussed the case with a Virginia doctor and had read the depositions of several Virginia doctors and testified that the standard of care in Virginia was the same as elsewhere). Thus, the trial court's decision will only be overturned if it was clearly erroneous. The Court's decision that Dr. Kaminsky was qualified to testify as an expert against Mr. Johnstone, LCSW, was appropriate and will stand.

## II. *Unsound Mind*

For purposes of this case, the Court defined "unsound mind" as "a mind not under the control of reason." The Court further defined "reason" as "the ability to think and form judgments and to understand the nature, consequences, and effects of one's acts." Defendants contend that the jury's conclusion that Mary was of unsound mind at the time she committed suicide was contrary to the law and evidence. Therefore, Defendants argue, the jury verdict must be set aside.

The common law roles of both the jury and the Court are well developed in Virginia. Once the plaintiff has made his prima facie case and survived a motion for summary judgment, the jury as fact-finder becomes the definitive decision-maker. It is the jury's responsibility to weigh the testimony of the witnesses and resolve any conflicts in the evidence. *Fobbs v. Webb Building Ltd. Partnership*, 232 Va. 227, 230 (1986). The jury may draw all reasonable inferences and deductions from the evidence adduced. *Id.* If reasonable minds could differ in the conclusions of fact to be drawn from the evidence, the jury is to draw those conclusions. *Id.* A trial judge cannot substitute his view for that of the jury merely because he would have reached a different conclusion had he been the fact-finder. *Id.*

Upon judicial review, a jury's verdict is afforded great deference. The party who received the favorable verdict is afforded "the benefit of all substantial conflict in the evidence and all fair inferences that may be drawn therefrom." *Id.*, citing *Walton v. Walton*, 168 Va. 418, 423 (1937).

"If there is conflict of testimony on a material point, or if reasonably fairminded men may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed by the trial court." *Hall v. Hall*, 240 Va. 360, 363 (1990) *citing Forbes & Co. v. Southern Cotton Oil Co.*, 130 Va. 245, 259 (1921). Furthermore, "every reasonable inference must be drawn in favor of a verdict that has been rendered fairly under proper jury instructions." *Hall*, 240 Va. at 363. Therefore, if the evidence supports the jury's findings, the jury's determination is dispositive. A trial court may set aside a jury verdict only when the verdict is plainly wrong or without credible evidence to support it. *Fobbs*, 232 Va. at 229.

Plaintiff's experts concluded that Mary was of unsound mind at the time of her suicide. In support of this conclusion, the experts testified that major depression is a biological problem which implicates nerve functioning and chemical imbalances in the body. They stated that this condition is a change in mood which affects everything, including a person's sense of vitality and self attitude. People suffering from major depression, according to the expert testimony, develop an irrational idea that everything about them is bad. Under the thrall of this change in the brain, such a person is only able to think in one way; a person can only form negative judgments. Such a person, according to the testimony, suffers impaired reason and judgment. The experts went on to say that when that person's impairment in reasoning reaches a sufficient degree, that person is of unsound mind.

Based on a review of the medical record and the testimony, Plaintiff's experts told the jury that Mary had reached that degree by the time she committed suicide. They stated that she was under the control of major depression and the disease did not allow her to reason, form judgments, or understand the nature and consequences of her acts. Additionally, each expert analyzed the suicide note in front of the jury and explained in detail how a person of sound mind could not have written such a note. Mary's actions, the experts testified, also support a determination that she was of unsound mind. For example, she left her three young children unsupervised on at least two occasions so that she could go to a pool hall; she had threatened suicide and had actually "rehearsed" the suicide by firing the gun into the ground.

Although two of the experts did admit, on cross-examination, that Mrs. Lovelace could form judgments, had the ability to think, and understood at

some level the consequences of her actions, those opinions were qualified. Where a witness gives any degree of contradictory testimony, the jury must weigh that testimony and resolve any differences in it. The jury could have resolved any such differences in favor of the Plaintiff. As a review of all of the foregoing testimony indicates and because of the standard of review for a motion to set aside a jury verdict, the jury's verdict is supported by the law and the evidence as to the issue of unsound mind and should be upheld.

### III. *Foreseeability and Proximate Cause*[2]

In Virginia, a negligence plaintiff must establish that there was, on the part of the defendant, "a legal duty, a breach thereof, and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence." *Jordan v. Jordan*, 220 Va. 160, 162 (1979). Thus, a plaintiff can establish liability under a negligence theory "for consequences which, in light of the attendant circumstances, could reasonably have been anticipated by a prudent man; but not for casualties which, though possible, were wholly improbable." *Norfolk Shipbuilding & Drydock v. Scovel*, 240 Va. 472, 475 (1990).

In addition to the elements described above, "the burden is on the plaintiff who alleges negligence to present evidence of preponderant weight from which a jury can find that the defendant's negligence was a proximate cause of the accident." *Jordan*, 220 Va. at 162. For example, "[n]egligence cannot be presumed from the mere happening of the accident." *Id.* "It is incumbent upon the plaintiff who alleges negligence to show why and how the accident happened, and if that is left to conjecture, guess or random judgment, he cannot recover." *Weddle, Adm'x v. Draper*, 204 Va. 319, 322 (1963); *see also, Lawson v. John Doe*, 239 Va. 477 (1990).

Dr. Urbano and Mr. Johnstone first claim that Plaintiff failed, as a matter of law, to prove that Mary's suicide was the foreseeable result of either of their actions, or lack of actions. This contention is belied by endless expert testimony to the contrary. The expert testimony reveals several general facts about the foreseeability of suicide, particularly in the case of those suffering from major depression. For example, the jury learned that although suicide is commonly a random and unpredictable event, it can be

---

[2] The same standards of review that apply to the jury determination of unsound mind, *supra*, apply to foreseeability and proximate cause.

reasonably predicted in the short run. The experts also stated that suicide is the major risk or complication of patients diagnosed with major depression. In fact, the experts explained, more than 50% of patients who commit suicide suffer from that condition, and 15% of all patients with the illness take their own life. In addition, the experts indicated that a person who has previously attempted suicide is at an increased risk for suicide. Lastly, they stated that a person who has been hospitalized for major depression following a suicide attempt is at a higher risk for suicide in the first one to two months following discharge.

Next, the experts pointed to specific facts that, to a reasonable degree of medical certainty, made Mary a particularly foreseeable suicide candidate. For example, upon her admittance into the hospital, Mary stated that she actually had a plan to commit suicide by going out, getting drunk, and then firing her husband's revolver into her head. Moreover, she had rehearsed/attempted the suicide, according to the experts, when she fired the gun into the ground. The experts also testified that she suffered from a chemical imbalance in the brain that was not being properly treated with antidepressant medications. In addition, Dr. Zillmer clearly stated in his report that Mary was suicidal and that she was a "smiling depressive" who was impulsive and unstable. Mary also had what the experts described as pseudoseizures at the time she was first scheduled to be discharged, indicating that she was getting worse rather than better. Mary was then discharged into the same stressful conditions that initially triggered the major depression. She met with Mr. Johnstone on several occasions and mentioned suicide, told stories about suicide, explained that she was depressed and lonely, and revealed that the gun was back in the house. Finally, Mary threw up the last red flag by cancelling two consecutive therapy appointments after a particularly bad session.

The Court recognizes that upon discharge, Dr. Urbano's duty ended and only Mr. Johnstone's responsibility for the patient continued. Nevertheless, with respect to each defendant, the looming potential for suicide that surrounded this patient was more than a mere possibility about which reasonable minds could not differ. Therefore, it would be improper for the Court to substitute its judgment for that of the jury on the issue of foreseeability. Accordingly, the jury's conclusion that Mary's suicide was foreseeable is upheld.

Alternatively, Defendants claim that reasonable minds could not differ that Defendants' acts and omissions did not proximately cause the death of

Mary. More specifically, Defendants claim that Plaintiff failed to prove the "how and why" of Mary's suicide.

The cases offered by Defendants which rely on the "how and why" language are drastically different from the case at bar. *See, e.g., Weddle, Adm'x v. Draper*, 24 Va. 319, 322 (1963). In *Weddle*, the plaintiff was killed when his car and the defendant's car collided at an intersection. No one witnessed the accident except the defendant. Both cars were thrown from the point of contact and no skid marks or debris indicated the location of the collision. The defendant was called as an adverse witness and testified that she slowly entered the intersection when the defendant came speeding out of nowhere with his lights off. A neighbor who lived up the street from the accident testified that the defendant drove by his house at an excessive rate of speed. Another person, who arrived on the scene shortly after the accident, testified that plaintiff's lights were burning after the accident. The trial court granted the defendant's motion to strike. The Supreme Court agreed, concluding that there was not enough evidence of "why and how" the accident occurred. *Id.* at 323. *See also, Lawson v. John Doe*, 239 Va. 477 (where plaintiff was fatally injured on the highway and where there were no witnesses and almost no physical evidence, there was no indication of "how and why" the accident occurred).

Unlike the cases offered by Defendants, the case at the bar is replete with evidence of how and why Mary's suicide occurred. For example, she took the very revolver with which she told Defendants that she had planned to commit suicide and with which she rehearsed/attempted suicide in the past and discharged it into her head. Each of Plaintiff's experts began their testimony with a summary of all of Defendants' acts and omissions that to a reasonable degree of medical certainty fell below the applicable standard of care and proximately caused such an act. They then went on to testify, based on their knowledge of the facts and records, as to the specifics of Defendants' breaches and the reasons why and how they resulted in the patient's death.[3]

Pertaining to Dr. Urbano, the testimony revealed that she failed to even attempt to prescribe the only proper curative treatment for major depres-

---

[3] Plaintiff, relying on Virginia Code §§ 8.01-401.1 and 8.01-401.3, argues that all that was required to establish proximate cause was the expert's conclusory statements to that effect. The Court need not resolve this issue because, as indicated, Plaintiff's experts went further and specifically addressed how Defendant's breaches resulted in Mary's injuries.

sion, which is antidepressant medications. The jury also heard that without such treatment, the patient's condition could only, and did, worsen. The expert testimony in support of foreseeability, *supra*, underscores this proposition. Finally, the jury was entitled to accept expert testimony that Dr. Urbano discharged a suicidal patient, without the proper treatment plan, into an environment brimming with life-threatening pressures. With respect to Mr. Johnstone, the expert testimony indicated that he, being privy to the patient's full psychological and medical profile, failed to intervene after he was confronted with information that Mary was in imminent danger of suicide.

These are among the many links that the jury was entitled to make between the Defendants' breaches of the standard of care and Mary's resulting suicide. It is not the province of this Court to interfere with the jury's function where there is at least some evidence to support their ultimate decision. Accordingly, the jury's conclusion that each Defendant's acts and omissions proximately caused Mary's death is upheld.

For the foregoing reasons, Defendants' motions to set aside the jury verdict and enter judgment in favor of Defendants is overruled.