# Richmond

BETTY J. BLY v. JOHN C. RHOADS.

March 5, 1976.

Record No. 741108.

Present, All the Justices.

*Earl M. Davis* [D.C.]; *Marden G. Dixon* [D.C.] (*Jack H. Olender* [D.C.], on brief), for plaintiff in error.

*Norman F. Slenker* (*Slenker, Brandt, Jennings & O'Neal,* on brief), for defendant in error.

*James A. Eichner,* for Association of Trial Lawyers of America, *amicus curiae.*

CARRICO, J., delivered the opinion of the court.

In this medical malpractice case, the plaintiff, Betty J. Bly, sought damages from the defendant, Dr. John C. Rhoads, for personal injuries

allegedly resulting from the defendant's negligence (1) in failing to inform the plaintiff of the "possible risk, complications, or dangers" of a hysterectomy he performed upon her, and (2) in failing to "conform to the usual and customary standards of medical care" in performance of the operation. At the conclusion of the plaintiff's case, the trial court struck her evidence and entered summary judgment in favor of the defendant.

Although the plaintiff originally assigned numerous errors, we awarded a writ of error limited to consideration of the following questions:

I. Is the expert testimony of a physician necessary to prove the requirements for liability under the informed consent doctrine?

II. Should the medical malpractice of a specialist be determined by a national standard rather than a "same or similar community" standard?

III. Are the medical staff by-laws and accreditation rules of a hospital admissible in evidence in a malpractice action against a physician-member of the staff?

Because these questions are purely legal in nature, a detailed recital of the evidence is unnecessary. For approximately eight years before the operation in question, the plaintiff had suffered from various female disorders, for which she had received treatment of one kind or another from a number of physicians and at different institutions. In April, 1970, she was referred by a general practitioner to the defendant, a specialist in obstetrics and gynecology practicing in Manassas, Prince William County.

The plaintiff's chief complaint was of abdominal pain, which the defendant diagnosed as caused by either pelvic inflammatory disease or endometriosis (disease involving the lining of the uterus). When, after conservative treatment, the complaint continued for several months, the defendant advised the plaintiff that a laparotomy (exploratory surgery) should be performed with the possibility that "a hysterectomy would have to be carried out at [the same] time." The plaintiff signed a form consenting to "Pelvic laparotomy, possible [complete] Hysterectomy." On October 27, 1970, the plaintiff entered Prince William County Hospital, and the defendant performed surgery on her the following day. In the operation, the plaintiff's uterus and left tube and ovary were removed.

Following the surgery, the plaintiff developed complications. Tests revealed that her ureter (the tube from the kidney to the bladder) was blocked. Correction of the problem required further hospitalization and surgery.

## I.

At trial, the court ruled that the plaintiff was required to produce expert testimony to establish liability under the informed consent doctrine. The plaintiff claims this was error.

The plaintiff contends that the doctrine of informed consent "requires that before a patient's consent to treatment is effective, the patient must have prior knowledge of the hazards and dangers that might be expected and the chances for favorable and unfavorable results." The objective of the doctrine, the plaintiff asserts, "is to insure the patient's right to self-determination by requiring that he have access to all knowledge necessary for him to give an intelligent and informed consent based on a rational examination of the available options." Her consent was not informed and therefore ineffective, the plaintiff says, because the defendant "failed to advise her that there were alternatives to the surgery" and because "the risks of hysterectomy were never explained" to her.

The plaintiff urges us to "adopt the modern trend in informed consent law, *i.e.*, that the testimony of a physician is unnecessary to prove liability." Pursuant to this modern trend, the plaintiff asserts, a physician is "bound by a direct legal obligation" to disclose "whatever information is material to the patient's decision;" and it is for the patient, not the physician, to decide what is "of importance . . . to permit the patient to make a decision." The standard of disclosure, therefore, the plaintiff continues, is determined by "the patient's need" to know and not by the "standards of the medical community." Thus, the plaintiff concludes, expert testimony is not necessary to establish lack of informed consent, but it may be established by lay testimony.

Alternatively, the plaintiff argues that even if we do not adopt the "legal obligation" standard, her failure to produce expert testimony on the issue of informed consent was not fatal to her case because the record otherwise shows that she "was never properly informed and her consent was not properly obtained for the procedure performed." In limiting the writ of error awarded in this case, however, we eliminated from consideration the plaintiff's alternative argument. We will consider, therefore, only the legal question presented by the writ

as limited, *viz.*, whether expert testimony is necessary to establish liability under the informed consent doctrine.

■ The doctrine of informed consent or, as it should more correctly be called, the rule requiring physicians to disclose to patients the alternatives to and risks of a particular treatment, is not new to this court. In *Hunter* v. *Burroughs*, 123 Va. 113, 133-34, 96 S.E. 360, 366-67 (1918), we recognized that "it is the duty of a physician in the exercise of ordinary care to warn a patient of possible bad consequences of using a remedy" but that the failure to warn "is not *per se* an act of negligence." Thus, while the law imposes a general duty to warn, a claimant in a malpractice action based upon negligence in failing to warn must prove the existence and extent of the duty in his particular case by a preponderance of evidence. But whether expert testimony is necessary to establish a breach of duty to warn is a question of first impression for this court.

In resolving this question, the decision of the United States District Court for the Eastern District of Virginia in *Dietze* v. *King*, 184 F.Supp. 944 (1960), is helpful. There, in a medical malpractice action involving Virginia law, Judge Hoffman stated:

> "The physician owes a duty to his patient to make reasonable disclosure of all significant facts under the circumstances of the then situation. This duty is, however, limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances, and the failure to disclose in all instances does not necessarily suggest a neglect of duty." 184 F.Supp. at 949.

This language clearly requires expert testimony to establish in what "instances" the duty to disclose arises and what disclosures "a reasonable medical practitioner would make under the same or similar circumstances." In other words, Judge Hoffman's holding requires expert testimony to establish in a particular case the existence and extent of the physician's duty to disclose information to his patient. If we adopt this requirement, the Virginia rule would comport with what we perceive to be the majority view in this country. *See* Annot., 52 A.L.R.3d 1084 (1973).

Before deciding, however, what rule to adopt, we must give due consideration to the plaintiff's strong urging that we embrace what she calls "the modern trend in informed consent law." This trend, the plaintiff asserts, envisions establishment of a rule permitting proof by

non-expert testimony of the existence and extent of a physician's duty to disclose information to his patient.

The "landmark case" in the "modern trend in informed consent law," the plaintiff says, is *Canterbury* v. *Spence*, 150 U.S. App.D.C. 263, 464 F.2d 772, *cert. denied*, 409 U.S. 1064 (1972). Although *Canterbury* holds that existence of the physician's duty to disclose arises from legal obligation, not from customary medical practice, and that the extent of the disclosure must be measured by "the patient's need" to know, the decision does not have the sweeping effect the plaintiff claims. With respect to the use of lay testimony, the case does establish that:

> "Lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment. Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision." 150 U.S. App. D.C. at 283, 464 F.2d at 792 (footnotes omitted).

Immediately before making this statement, however, the *Canterbury* court expressed the following opinion with respect to informed consent cases:

> "There are obviously important roles for medical testimony in such cases, and some roles which only medical evidence can fill. Experts are ordinarily indispensible to identify and elucidate for the fact-finder the risks of therapy and the consequences of leaving existing maladies untreated. They are normally needed on issues as to the cause of any injury or disability suffered by the patient and, where privileges are asserted, as to the existence of any emergency claimed and the nature and seriousness of any impact upon the patient from risk-disclosure. Save for relative infrequent instances where questions of this type are resolvable wholly within the realm of ordinary human knowledge and experience, the need for the expert is clear." 150 U.S.App.D.C. at 282-83, 464 F.2d at 791-92 (footnote omitted).

We concur in this latter statement concerning the necessity of expert testimony. Further, we would agree that a patient-plaintiff can establish by lay testimony that his physician did not disclose particular risk information and that he, the patient, had no knowledge of the

risk. We would also agree that in some cases lay testimony might be competent to show the adverse consequences following treatment. And we can envision situations, albeit relatively infrequent, where from ordinary human knowledge and experience the necessity of disclosure is so obvious that expert testimony should not be required.

Beyond this, however, we cannot agree with *Canterbury* or the subsequent decisions adopting a similar view.[1] Particularly, we disagree with *Canterbury* to the extent that in all cases it permits establishment of the existence and scope of a physician's disclosure duty without reference to medical standards. Even under the *Canterbury* rationale, a physician is not required to disclose all risks possibly inherent in a particular treatment. Neither does the *Canterbury* rationale permit lay testimony to substitute where matters of medical judgment are involved in the physician-patient decision making process. Nor must a physician communicate information which the patient already knows or of which any reasonably intelligent person should be aware. And *Canterbury*, although leaving much to lay testimony, recognizes that it is the *physician* who "always . . . must make a judgment, in terms of materiality, as to whether and to what extent revelation to the patient is called for." 150 U.S.App.D.C. at 278, 464 F.2d at 787. To then test such a judgment by the inexact lay standard of "the patient's need" to know is, in our opinion, both inconsistent and unrealistic.

The matters involved in the disclosure syndrome, more often than not, are complicated and highly technical. To leave the establishment of such matters to lay witnesses, in our opinion, would pose dangers and disadvantages which far outweigh the benefits and advantages a "modern trend" rule would bestow upon patient-plaintiffs. In effect, the relaxed "modern trend" rule permits lay witnesses to express, when all is said and done, what amounts to medical opinion. Undoubtedly, such a rule would cause further proliferation of medical malpractice actions in a situation already approaching a national crisis. This is a result which, if at all possible consonant with sound judicial policy, should be avoided.

We believe the better rule, which we now adopt, is to require a patient-plaintiff to show by qualified medical experts whether and to

---

[1] *E.g., Cobbs* v. *Grant,* 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1 (1972); *Fogal* v. *Genessee Hosp.,* 41 App.Div.2d 468, 344 N.Y.S.2d 552 (1973); *Congrove* v. *Holmes,* 37 Ohio Misc. 95, 308 N.E.2d 765 (Ct. C.P. 1973); *Wilkinson* v. *Vesey,* 110 R.I. 606, 295 A.2d 676 (1972); *Miller* v. *Kennedy,* 11 Wash.App. 272, 522 P.2d 852 (1974), aff'd per curiam, 85 Wash.2d 151, 530 P.2d 334 (1975); *Trogun* v. *Fruchtman,* 58 Wis. 2d 569, 207 N.W.2d 297 (1973).

what extent information should be disclosed by the physician to his patient. This rule would not, contrary to what *Canterbury* suggests, impose an undue burden upon the patient-plaintiff. After all, in the usual case, the patient unquestionably will have obtained experts to establish the negligent treatment phase of his malpractice action. In the informed consent phase of the action, the patient must produce, even under the *Canterbury* rule, expert testimony to identify and elucidate the risks of treatment and to establish the cause of any injury or disability suffered by the patient. And, as we have indicated, in the ordinary case, as here, the patient must produce expert testimony to show the adverse consequences following treatment. It adds but little to his burden when he must also show by experts that prevailing medical practice requires disclosure of certain information, that the information is material to an informed decision on treatment, and that disclosure would not pose an unreasonable threat of detriment to the patient's well-being or to his ability to make a rational decision.

In the present case, therefore, the plaintiff was required to produce expert testimony to establish the foregoing requirements in the informed consent phase of her malpractice action. The plaintiff did produce an expert, but the court ruled his testimony inadmissible under the court's interpretation of applicable standards. Next, we investigate the correctness of that ruling.

## II.

In this Part, we consider the plaintiff's contention that the medical malpractice of a specialist should be determined by a national standard rather than by a community standard. We also consider the plaintiff's assertion that, even if a national standard is not applicable, she proffered expert testimony in the court below sufficient by a community standard to establish the negligence of the defendant.

At trial, the plaintiff produced Dr. Louis Gerstley, a nationally "Board certified" specialist in obstetrics and gynecology practicing in Abington, a suburb of Philadelphia, Pennsylvania, to establish the defendant's negligence in both phases of the plaintiff's malpractice action. At the end of a lengthy hypothetical recitation, counsel for the plaintiff asked Dr. Gerstley whether the defendant, also a "Board certified" specialist, "met the appropriate standard of a Board certified obstetrician" in caring for the plaintiff. Upon the defendant's objection that a "Board Certified" standard was not proper, the objection was sustained.

Thereafter, counsel for the plaintiff attempted to show by Dr. Gerstley "the standard of medical practice of Board certified obstetrician-gynecologists who practice" in a locality similar to Prince William County. When Dr. Gerstley admitted he was unfamiliar with Prince William County, the court ruled that the "similar local community" standard had not been met, and the defendant's further objection was sustained. Doctor Gerstley's testimony then was proffered for the record.

In Virginia, at least since 1918, when we decided *Hunter v. Burroughs, supra,* 123 Va. at 131, 96 S.E. at 366, the standard of due medical care applicable to specialists has been that of "other like specialists in good standing, in the same or similar localities as defendant." We reiterated this rule in *Fox v. Mason,* 139 Va. 667, 671, 124 S.E. 405, 406 (1924),[2] where we set out the "same or similar community" standard applicable to physicians and surgeons and then said, "[t]he rule is the same as to specialists."

We acknowledge, as the plaintiff points out, that changes in communication, education, and attitudes have resulted in the abandonment by some jurisdictions of locality standards in favor of a national standard for determining medical malpractice of specialists.[3] And we cannot deny the apparent merit of the arguments favoring change to a national standard applicable to specialists.

We are firmly of the view, however, that such a material change in the substantive law of Virginia should not be accomplished by the mere brush of the judicial pen. The Virginia "same or similar community" standard is imbedded in the jurisprudential law of this Commonwealth; it has been long relied upon by lower courts, the legal and medical professions, and the public. If for no other reason, we reject the challenge for change because basic concepts of *stare decisis* dictate maintenance of the established law.

Sound considerations of policy also militate against a bench change of the present law. We have noted in Part I the critical national situation caused by proliferating medical malpractice litigation. If any changes in the substantive rules applicable to such litigation are to be

[2] *Fox v. Mason* was overruled on another point in *Madison v. Kroger Grocery Co.,* 160 Va. 303, 309-10, 168 S.E. 353, 355-56 (1933). *Fox,* however, still stands for the proposition cited in the text above.

[3] *E.g., Kronke v. Danielson,* 108 Ariz. 400, 499 P.2d 156 (1972); *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968); *Naccarato v. Grob,* 384 Mich. 248, 180 N.W.2d 788 (1970); *Carbone v. Warburton,* 11 N.J. 418, 94 A.2d 680 (1953); *Shier v. Freedman,* 58 Wis.2d 269, 206 N.W.2d 166 (1973); *see Hundley v. Martinez,* 151 W. Va. 977, 158 S.E.2d 159 (1967).

made midstream of the controversy, the legislature and not this court should be the recipient of the pleas for change.

In the present case, absent applicability of a national standard, the testimony proffered by the plaintiff was insufficient to qualify Dr. Gerstley as an expert to establish the negligence of the defendant under the proper standard, *viz.*, the "same or similar community" rule. The plaintiff failed to establish through Dr. Gerstley or any other witness that Prince William County is similar to Abington, Pennsylvania, where Dr. Gerstley practiced, or to any other community with whose standard of practice Dr. Gerstley was familiar. It was not error, therefore, for the trial court to sustain the defendant's objections to the testimony of Dr. Gerstley.

For the reasons cited in Parts I and II hereof, we hold that the plaintiff did not present expert testimony sufficient to create a jury issue of the defendant's negligence in either phase of her malpractice action. Accordingly, the trial court did not err in striking the plaintiff's evidence, and she is not entitled to reversal of the judgment below and a remand of the case.

### III.

Remaining is the potential issue of the admissibility of the medical staff by-laws and accreditation rules of Prince William County Hospital, where the plaintiff's operation was performed. The trial court refused to admit this material when it was offered by the plaintiff, and the plaintiff contends the court therein erred.

Because, as we have demonstrated in Part II hereof, the plaintiff is not entitled to reversal and remand because she did not present in the court below expert testimony sufficient to create a jury issue of the defendant's negligence in performing the hysterectomy, the issue of the admissibility of the hospital regulations is now moot. The plaintiff concedes that the regulations would not have "exclusively determine[d] the standard of care" applicable to the defendant. Without expert testimony on the standard of care, a deviation from the standard, and causation, the hospital regulations, standing alone, would not have taken the case to the jury. While arguably the trial court's ruling is supported by precedent (*see Virginia Railway and Power Co. v. Godsey*, 117 Va. 167, 168-69, 83 S.E. 1072, 1072-73 (1915)), we do not decide this issue.

The judgment of the trial court will be affirmed.

*Affirmed.*