Present:  All the Justices

FRED S. BLACK

                                    OPINION BY
v.  Record No. 990065    CHIEF JUSTICE HARRY L. CARRICO
                                  November 5, 1999
MARK R. BLADERGROEN, M.D., ET AL.

          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Randall G. Johnson, Judge

     In this medical malpractice case, the sole question

for decision is whether the trial court erred in excluding

the testimony of a medical expert called by the plaintiff.

Finding the trial court's action erroneous, we will

reverse.

     In a motion for judgment filed October 17, 1996, the

plaintiff, Fred S. Black, sought to recover damages from

the defendants, Mark R. Bladergroen, M.D., Harold J.

Levinson, M.D.,[1] Thomas P. Christopher, M.D., and Cardiac

Surgical Associates, Ltd.[2]  In the motion for judgment,  the

plaintiff alleged that the individual defendants, Drs.

Bladergroen, Levinson, and Christopher, were duly licensed

physicians who carried on a practice of cardiac surgery in

the employment of the corporate defendant, Cardiac Surgical

---

     [1] Upon Dr. Levinson's death on November 3, 1997, his
executrix, Heidi S. Levinson, was substituted as a party
defendant in his place.
     [2] A number of other health care providers were also
named as defendants, but they were dismissed from the case
on motions for summary judgment or voluntary nonsuit and
are not parties to this appeal.

Associates, Ltd.  The plaintiff alleged further that the defendants' negligence resulted in the amputation of his right leg during a period of hospitalization in 1994.

A jury trial resulted in a verdict in favor of the defendants, upon which the trial court entered judgment. We awarded the plaintiff this appeal.

Prior to the events in question, the plaintiff had suffered from heart disease for some time and had endured two heart attacks.  In October 1994, he experienced pain and was admitted to Henrico Doctors Hospital, where he came under the care of the defendant physicians.  Following cardiac bypass surgery, he developed complications.  His blood pressure dropped to dangerously low levels, and he had problems with circulation in his right leg.  When the circulatory problems could not be corrected, the leg was amputated.  The plaintiff was diagnosed as having suffered an anaphylactic reaction, which set off a chain of events resulting in the loss of the leg.

During his case-in-chief, the plaintiff called W. Dudley Johnson, M.D., a board-certified thoracic surgeon from Milwaukee, Wisconsin, to testify as an expert on the standard of care applicable to the defendants' treatment of the plaintiff.  On voir dire examination, Dr. Johnson stated that he attended the University of Illinois Medical

2

School, and, after finishing medical school and an internship, entered surgical training, which consisted of four years of general surgery and two years of heart surgery. He was an associate clinical professor of surgery at the medical school in Milwaukee, belonged to numerous medical associations and societies, and had served on the Wisconsin State Medical Licensing Board, in which capacity he examined the credentials of "[a]ll kinds of physicians . . . from all over the country and around the world" who wanted to come to Wisconsin to practice medicine.

Dr. Johnson testified further that he "initially developed and perfected the modern [coronary] bypass operation [which] is now done throughout the world" and that he was "the first person to put in two, three, four, five, six bypasses" and the first to "describe secondary operations and . . . third and fourth operations for coronary disease." He said that he personally had performed between eight and nine thousand cardiac operations, that he had operated in eight or nine foreign countries, and that patients had come to him for surgery from approximately thirty-five foreign countries and every state in the union. He also said that "around 68" of his patients had come from Virginia and that he had operated on "47 or 48" of them. He had reviewed the records of his

Virginia patients and had communicated with their Virginia surgeons and cardiologists regarding their care and treatment.

When asked on direct examination whether he was "familiar with the standard of care that would have been adhered to by a reasonably prudent board-certified cardiothoracic surgeon practicing in Virginia in 1994," Dr. Johnson said, "Yes." When asked to tell the jury "how [he had] that familiarity," he stated: "Because all the surgeons in the country take the same required exams. There is one national board and one national certification for heart surgeons. We don't have a certification for heart surgeons in Wisconsin. I don't know of any state that has separate certifications for any specialty."

On redirect examination, Dr. Johnson testified he knew what the Virginia standard of care is because of his "background and experience and several years on [the Wisconsin] medical board [reviewing credentials of all] kind of physicians . . . from all over the country" and because Virginia cardiothoracic surgeons "have to go through the same training and take the same exams as every other thoracic surgeon . . . in the country." When asked whether "there is any board certification of thoracic

4

surgeons applicable only to Virginia," he answered, "No . . . [t]hey took the same ones I took.  National exams."

In urging the trial court to exclude the testimony of Dr. Johnson, the defendants offered no evidence of their own.  Instead, they relied solely on  testimony he gave on cross-examination.  In response to defense counsel's questions, Dr. Johnson stated that he had never been licensed to practice in Virginia, that he had never performed surgery in Virginia, and that he had neither demonstrated nor witnessed heart surgery performed in Virginia.  He stated that while he had discussed topics relating to cardiac surgery in general with cardiac surgeons at national or regional meetings, he was "not certain whether any of those cardiac surgeons actually practice in Virginia."  He admitted he could not name any patient referred to him from Virginia with a history similar to the plaintiff's.  And, finally, in what the defendants term a "concession," he said he thought he was familiar with the Virginia standard of care for cardiac surgeons because he believed "there is a national standard of care applicable."

On appeal, citing Bly v. Rhoads, 216 Va. 645, 222 S.E.2d 783 (1976), the defendants say this Court "has firmly rejected the availability in Virginia of a recourse

5

in a medical malpractice action to a national standard of care" on the ground it is for the General Assembly to decide whether there should be a national standard. Id. at 652-53, 222 S.E.2d at 789; see also Poliquin v. Daniels, 254 Va. 51, 55, 486 S.E.2d 530, 533 (1997); Henning v. Thomas, 235 Va. 181, 186, 366 S.E.2d 109, 112 (1988). In Bly, we said a community standard of care applied in Virginia. However, following Bly, the General Assembly enacted Code § 8.01-581.20 and established a statewide standard. 1979 Va. Acts ch. 325.

We have no intention of retreating from the position we took in Bly that it is for the General Assembly to say whether a national standard of care should apply in Virginia and, hence, we have no inclination to adopt such a standard ourselves. But nothing in Bly or any other provision of law prohibits Virginia physicians from practicing according to a national standard if one exists for a particular specialty, even though neither the General Assembly nor this Court has adopted such a standard.

Moreover, the law concerning medical experts has changed since we decided Bly. In an amendment to Code § 8.01-581.20, the General Assembly created a presumption that favors the admissibility of the testimony of medical experts, including out-of-state experts. 1989 Va. Acts ch.

6

Thus, the question in this case is simply whether Dr. Johnson's statements on cross-examination, including his "concession" in which he related the Virginia standard of care to the standard elsewhere, were sufficient to overcome the presumption provided by Code § 8.01-581.20.

The statutory language creating the presumption reads as follows:

> Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified and certified. <u>This presumption shall also apply to any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia</u>. [Emphasis added.]

The defendants raise a preliminary question. They argue that the plaintiff failed to establish Dr. Johnson's entitlement to the presumption provided by Code § 8.01-581.20. However, Dr. Johnson was asked on his voir dire examination whether he "possess[ed] the qualifications to take the Virginia licensing to become licensed in Virginia," and he replied, "I believe I do, yes, sir."

At the conclusion of the voir dire hearing, the trial court refused to allow Dr. Johnson to testify. The refusal, however, was not on the ground the doctor was not entitled to the presumption but because he lacked familiarity with the Virginia standard of care.

7

The next day, the plaintiff offered into evidence a sworn letter from the Commonwealth's Department of Health Professions, Board of Medicine, stating that Dr. Johnson's credentials "meet the educational and examination requirements for licensure in Virginia." The trial court refused to admit the letter on the ground it came too late, but, when the plaintiff's counsel asked the trial judge whether he "accepted the [previous day's] testimony of Dr. Johnson that he met the educational and examination requirements for licensure," the judge stated: "I accept that testimony."

The defendants failed to make any objection in the trial court to Dr. Johnson's testimony concerning his qualifications for licensure, to the trial judge's acceptance of that testimony, or to the sufficiency of the evidence offered to invoke the presumption provided by Code § 8.01-581.20. Because the defendants raise the question whether the plaintiff established Dr. Johnson's entitlement to the presumption for the first time on appeal, we will not consider the question. Rule 5:25.

This brings us to the question whether the defendants rebutted the presumption provided by Code § 8.01-581.20. The trial court held that the defendants had overcome the presumption by showing on cross-examination of Dr. Johnson

that he "has never talked to anyone in Virginia, he never practiced in Virginia, [and] he has never read about what the standard of care is in Virginia." However, Dr. Johnson stated that he had reviewed the records of his Virginia patients and had communicated with their surgeons and cardiologists about their treatment; the presumption provided by Code § 8.01-581.20 is not predicated upon previous practice in Virginia; and the evidence showed that there was no "such thing as a Virginia textbook of cardiothoracic surgery" for Dr. Johnson to read.

Furthermore, "there is no rigid formula to determine the knowledge or familiarity of a proffered expert concerning the Virginia standard of care. Instead, that knowledge may derive from study, experience, or both." Henning v. Thomas, 235 Va. at 186, 366 S.E.2d at 112. Dr. Johnson's extensive "background and experience" and his familiarity with the manner of practice of "[a]ll kind of physicians . . . from all over the country" offset any effect the shortcomings perceived by the trial court may have had upon the presumption. Hence, the matters listed by the trial court were insufficient to overcome the presumption.

Neither do we consider that Dr. Johnson's "concession," in which he related the standard of care in

9

Virginia to the standard elsewhere, had any effect upon the presumption. Once the plaintiff established that Dr. Johnson met the educational and examination requirements for licensure in Virginia and, therefore, was entitled to the statutory presumption that he knew the Virginia standard of care for cardiothoracic surgeons, the burden shifted to the defendants to show Dr. Johnson was wrong in his premise that the Virginia standard and the standard elsewhere are the same. To carry this burden, the defendants were required to show that the Virginia standard differs from the standard elsewhere. See Griffett v. Ryan, 247 Va. 465, 473, 443 S.E.2d 149, 154 (1994). Yet, the defendants produced not a scintilla of evidence on the point, and the presumption remained intact.

We do not overlook the rule that "the question whether an expert is qualified rests largely within the sound discretion of the trial court," Henning v. Thomas, 235 Va. at 186, 366 S.E.2d at 112, or the maxim that "[a] decision to exclude a proffered expert opinion will be reversed on appeal only when it appears clearly that the witness was qualified." Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). But, in light of the defendants' failure to overcome the presumption provided by Code § 8.01-581. 20, it appears clearly that Dr. Johnson was qualified.

Accordingly, it was error for the trial court to exclude his testimony.

The defendants argue, however, that the plaintiff "has utterly failed to demonstrate reversible error." Their argument is two fold. First, they say that the plaintiff "includes in his Brief of Appellant no discussion of the testimony he hoped to elicit from Dr. Johnson" and, thus, has given this Court "no basis to evaluate the prejudice he now . . . avers he suffered when the trial court excluded Dr. Johnson from testifying on the standard of care applicable to the defendant doctors."

Second, the defendants say that the plaintiff "obtained the standard of care testimony he sought from Dr. Johnson from another expert witness, Dr. [Alfred Joseph] Martin, [Jr.]," and the plaintiff fails to explain "how the exclusion of Dr. Johnson prejudiced him . . . in light of his success in eliciting the same category of evidence sufficient to get his case to the jury."

We disagree with the defendants. In the following passage from his Brief of Appellant, the plaintiff refutes the first prong of the defendants' argument by providing this basis to evaluate the prejudice he avers he suffered when the trial court excluded Dr. Johnson's testimony:

11

The Court's ruling excluding the testimony of Dr. Johnson clearly prejudiced the plaintiff, Fred Black. He made an appropriate proffer setting forth what Dr. Johnson's testimony against each of the defendants would have been had he been permitted to give it. . . . More importantly, Dr. Johnson was not only qualified to testify as to the Virginia standard of care, he is a world authority whose accomplishments have been accorded international recognition and is the father of the operative procedure out of which this suit arose. His testimony would have carried great weight with the jury. Counsel in opening statements informed the jury of who Dr. Johnson was and expressed great pride in the fact that he was going to testify on the behalf of the plaintiff. When the court refused to let him testify, Fred Black and his counsel . . . lost credibility with the jury.

In the following passage from his reply brief, the plaintiff answers the second prong of the defendants' argument by providing this explanation of how the exclusion of Dr. Johnson's testimony prejudiced him despite his ability to get his case to the jury with Dr. Martin's testimony:

Dr. Johnson is a world authority on cardiovascular surgery, which is the same specialty as the defendants in this case. . . . Dr. Martin . . . is from a different specialty, vascular surgery, and while he was qualified as being from a related field, he could certainly by no stretch of the imagination be claimed to be a world authority. While much of what he testified to was similar to the proffer that was made for Dr. Johnson, no argument can genuinely be made that his testimony carried as much weight as Dr. Johnson's would have.

For the error in excluding Dr. Johnson's testimony, the judgment of the trial court will be reversed and the

12

case remanded for a new trial in which the doctor's testimony shall be allowed.

<u>Reversed and remanded</u>.