# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-30896

United States Court of Appeals
Fifth Circuit

**FILED**

September 17, 2015

Lyle W. Cayce
Clerk

DINA M. ROBLES BUSH,

Plaintiff - Appellant Cross-Appellee

v.

UNITED STATES OF AMERICA,

Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before WIENER, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

For the reasons explained below, we AFFIRM the district court's order denying the United States of America's (the "Government's") motion for summary judgment, its order denying the Government's motion for judgment on partial findings, and its amended judgment.

## FACTS AND PROCEEDINGS

The decedent, Pete Bush ("Pete"), suffered from serious heart issues. By the fall of 2008, he "had only days or weeks to live," and to save his life, doctors at the McGuire VA Medical Center ("McGuire") in Richmond, Virginia, surgically implanted a HeartMate II Left Ventricular Assist Device ("LVAD")

in Pete's chest. The LVAD is manufactured by the Thoratec Corporation ("Thoratec").

One month after Pete's surgery, while he was still recuperating at McGuire, Thoratec issued an "Urgent Correction Notice" (the "Notice"). The Notice explained that "wear and fatigue of the percutaneous lead connecting the [LVAD] blood pump with the external System Controller may result in damage that has the potential to interrupt pump function and may require a reoperation to replace the pump."[1] The Notice warned that failure to replace the pump could cause death. It also explained that "[d]amage to the electrical conductors within the lead may or may not be preceded by visible damage to the outer layer of the lead," but could be "evidenced by . . . transient alarms due to short or open circuits, often associated with movement of the patient or the lead."

A nurse named Lisa Martin ("Martin") taught Pete and his wife, plaintiff-appellant Dina M. Bush ("Mary") (collectively, the "Bushes"), about the various warning alarms and lights that the LVAD could emit, along with the proper response to each. Generally speaking, she told them that "intermittent alarms [were] not life-threatening," while "continuous alarms [we]re." Mary testified that neither Martin nor Pete's heart surgeon, Dr. Gundars Katlaps ("Katlaps"), told the Bushes about the Notice or its contents.[2]

Mary testified that the night before Pete died, they "heard a lot [of] little beep[s], light beep[s] and he was on the power base and we got up and we checked everything in the machine [to] see if it was something wrong." She further testified that they did everything Martin instructed them to do but

---

[1] A "percutaneous lead" is a wire-like device that is inserted through the skin to connect implanted medical devices with external equipment.

[2] There was conflicting testimony on this point, but the district court credited Mary's account. The district court did not clearly err, so we accept its credibility determination. *See, e.g., Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990).

No. 14-30896

found nothing amiss. Because the LVAD seemed to be working, they "went back to sleep." In the morning, they heard the same "light beep[s]," but once again, they could not find any problem with the device. This time, the Bushes decided to change Pete's "controller." When they did so, "there was a noise coming," but "there was nothing showing on the power base [that] there was something wrong, no noise, no nothing." "[I]t was just a noise in the controller, and [Pete] got himself and the batteries and he said he was feeling fine." The Bushes decided to call Martin. They left a message for her and asked her to call back when she could. Martin returned their call a few hours later. Mary put the phone up to the LVAD's external equipment so Martin could hear the beeps. During the call, Pete started to feel dizzy, and Martin instructed Mary to keep Pete "on batteries until we[] see what's going on." Still, she told Mary not to worry unless there was a loud beep, in which case, Mary should take Pete to the hospital. Martin then told Mary that she would call Thoratec to get further information. Shortly after Mary ended her call with Martin, the LVAD emitted a loud beep and displayed a red light. Mary's daughter called 9-1-1, but Pete died shortly afterward. Mary testified that, had she known that transient beeps from the LVAD could signal a serious problem, she would have gotten help for her husband.

Mary sued Thoratec in Louisiana state court, but Thoratec removed the case to federal court. In October 2012, Mary filed a third amended complaint. As before, she stated claims against Thoratec. But for the first time, she also asserted a Federal Tort Claims Act ("FTCA") claim[3] against the Government based on medical malpractice allegedly committed by Katlaps and Martin.

---

[3] *See* 28 U.S.C. § 2674.

No. 14-30896

The Government moved for summary judgment, arguing that the Virginia Medical Malpractice Act[4] "contains a threshold expert certification of merit requirement," and that "[f]ailure to comply with this threshold requirement results in dismissal." *See* Va. Code Ann. § 8.01-20.1. Contending that Mary had failed to satisfy the requirement, the Government asked the district court to grant summary judgment. The district court denied the motion, holding, *inter alia*, that the common knowledge exception to the expert evidence requirement applied because Mary's FTCA claim could be evaluated by a layperson without the aid of expert testimony.

In November 2013, on the eve of trial, Mary settled with Thoratec, and the district court dismissed Mary's claims against Thoratec without prejudice.[5] The district court then conducted a bench trial on Mary's FTCA claim against the Government. The Government made an oral motion under Federal Rule of Civil Procedure 52(c) for judgment on partial findings,[6] which the district court denied. The court then found the Government liable and entered judgment in the amount of $223,535 "with a credit for the amount of consideration paid for the prior settlement [with Thoratec], in addition to court costs and judicial interest from the date of the judgment until paid."

Mary filed a motion for a new trial or to amend the judgment arguing, *inter alia*, that the United States was liable for Pete's funeral expenses. The Government also moved to amend the judgment, arguing that the district court's order that it pay interest conflicted with the law governing awards of interest in FTCA cases. The Government also asked the court to clarify the amount due after the credit for the settlement award. In its response, the

---

[4] *See Simpson v. Roberts*, 752 S.E.2d 801, 803-04 (Va. 2014) (discussing Act's history).

[5] The terms of the settlement agreement are sealed.

[6] The Government argued, as it does on appeal, that the common knowledge exception to Virginia's expert evidence requirement does not apply in this case.

4

No. 14-30896

Government conceded that it was liable for Pete's funeral expenses. The district court thus granted Mary's request for funeral expenses but otherwise denied her post-trial motion. The district court granted the Government's post-trial motion in full. The district court then entered an amended judgment, reaffirming Mary's original award and adding Pete's funeral expenses. It also stated the exact amount owed by the Government after the credit for the settlement award.[7]

Mary appealed the district court's amended judgment. The Government cross-appealed from the district court's denials of its motions and from the amended judgment.

## STANDARD OF REVIEW

"In an appeal from a district court's final judgment following a bench trial, we review the district court's findings of fact for clear error and review conclusions of law de novo." *Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 654 (5th Cir. 2012).

The FTCA provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Thus, "[t]he components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred." *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir. 1979). Mary's claims against Thoratec were governed by Louisiana law, while her claims against the Government are governed by Virginia law.

---

[7] Because comparing the original judgment with the amended judgment would allow non-parties to determine the amount of Mary's settlement award, the district court filed the amended judgment under seal.

5

No. 14-30896

**DISCUSSION**

I.

The Government argues that the district court erred as a matter of law when it applied Virginia's common knowledge exception and held that Mary had proved her medical malpractice claim without offering expert testimony. We disagree.

A. Relevant Virginia Law Governing Mary's Medical Malpractice Claim

Under Virginia law, a plaintiff asserting a medical malpractice claim must establish: (1) the applicable standard of care;[8] (2) "that the defendant violated the applicable standard of care and was therefore negligent"; and (3) "that the defendant's negligent acts were a proximate cause of the injury." *Howell v. Sobhan*, 682 S.E.2d 938, 941 (Va. 2009). "[E]xpert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." *Webb v. Smith*, 661 S.E.2d 457, 459 (Va. 2008) (quoting *Raines v. Lutz*, 341 S.E.2d 194, 196 (Va. 1986)).[9] But Virginia has long recognized an exception to this rule in "those rare cases in which a health care provider's act or omission is clearly negligent within the common knowledge of laymen." *Id.* (quoting *Raines*, 341 S.E.2d at 196 n.2); *see also* Va. Code. Ann. § 8.01-20.1.

B. The District Court Did Not Err When It Found the Government Liable Based on Katlaps's and Martin's Failure to Inform the Bushes About the Notice

---

[8] Virginia law "provides for a statewide standard of care in medical malpractice cases unless a health care provider proves that a local standard of care is more appropriate." *Poliquin v. Daniels*, 486 S.E.2d 530, 533 (Va. 1997); *see* Va. Code Ann. § 8.01-581.20 ("[T]he standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth . . . .").

[9] The Government does not challenge the application of the common knowledge exception to the district court's causation determination.

No. 14-30896

Mary alleges that Katlaps and Martin committed malpractice when they failed to inform her about the possibility of a "transient alarm" and the serious risk it signaled.[10] Because the Bushes were primarily responsible for identifying and responding to the alarms emitted by the LVAD, we agree that this was malpractice. And we hold that Mary was not required to adduce expert testimony to prove her claim.

In *Beverly Enterprises-Virginia, Inc. v. Nichols*, 441 S.E.2d 1 (Va. 1994), the Virginia Supreme Court applied the common knowledge exception in a case where a healthcare administrator failed to share information necessary for appropriate care with primary caretakers. Blanche Nichols suffered from Alzheimer's disease, and while in her sons' care, she choked on her food on two occasions. *Id.* at 2. Blanche's sons later placed her in a nursing home. One of them informed the nursing home's administrator about Blanche's choking incidents and told him that she could not eat by herself. Blanche's daughter-in-law separately informed the administrator about the choking incidents. *Id.* Blanche choked to death after a nursing home employee delivered her a food tray without staying to help her. *Id.* at 2-3. It was not clear whether the employee who delivered the tray knew that Blanche needed help, but it was evident that the nursing home failed to tell other employees about Blanche's needs. *Id.* at 2. Blanche's estate sued for medical malpractice without offering expert testimony to establish the relevant standard of care or breach. *Id.* at 3. The nursing home argued that the estate's case failed because there was no expert testimony. But the Virginia Supreme Court rejected that argument. The court held that expert testimony is not required when "the alleged act of negligence clearly lies within the range of the jury's common knowledge and

---

[10] She also alleges that Martin committed malpractice by failing to diagnose the problem with Pete's LVAD on the day of his death. Because we decide this case based on Mary's first theory of malpractice, we do not consider her second theory.

experience." *Id*. And it reasoned that, because "[t]he defendant knew that [Blanche] was unable to feed herself and that she had two prior serious choking incidents," the jury did not need expert testimony to find that the nursing home "was negligent because its employees failed to assist Mrs. Nichols" after "le[aving] a tray of food with [her] and fail[ing] to provide assistance to her." *Id*.[11]

This case is similar to *Beverly Enterprises*. The Government's own expert testified that it was important "that patients were properly educated on how to react to alarms." Although Katlaps and Martin knew that a transient beep from the LVAD could be a sign of a serious malfunction, they failed to inform the Bushes about the risk indicated by such a sound. In these circumstances, a layman could determine that Katlaps and Martin breached the relevant standard of care.

The government argues that this case is more similar to *Bly v. Rhoads*, 222 S.E.2d 783 (Va. 1976), *superseded by statute on other grounds as recognized in Henning v. Thomas*, 366 S.E.2d 109 (Va. 1988). In *Bly*, a patient alleged that her doctor committed medical malpractice when he failed to inform her of the risks related to her upcoming surgery and alternatives to the procedure. She claimed that the doctor's failure amounted to a failure to obtain informed consent. *See id*. at 785. The court held that the patient was required to offer expert testimony to show that her doctor's failure to fully inform her of the risks breached the relevant standard of care. *Id*. at 788. Because the plaintiff's

---

[11] The Virginia Supreme Court has applied the exception in several other cases. *See, e.g., Webb*, 661 S.E.2d at 459 (holding that expert testimony not required to show that, where doctor performed only one of two promised surgical procedures, doctor's failure was proximate cause of need for second surgery); *Coston v. Bio-Med. Applications of Va., Inc.*, 654 S.E.2d 560, 563 (Va. 2008) (holding same when medical center employees twice placed patient in chair that broke and caused her to fall); *Dickerson v. Fatehi*, 484 S.E.2d 880, 882 (Va. 1997) (holding same when doctor left syringe in patient's neck after surgery).

expert was not qualified to testify, the court affirmed the dismissal of her claim. *Id.* at 789.

*Bly* is distinguishable. First, *Bly* addresses a pure question of law: whether "expert testimony of a physician [is] necessary to prove the requirements for liability under the informed consent doctrine." *Id.* at 784. The patient in *Bly* advocated for the "modern trend," which bases the standard of care on "'the patient's need' to know" the risks of a procedure rather than "the standards of the medical community." *Id.* at 785. The *Bly* court reaffirmed the traditional rule that the duty to inform is based on the local standard of care, and thus also reaffirmed the traditional rule that expert testimony is generally required. *See id.* at 787. Nevertheless, the court acknowledged that the common knowledge exception remained viable, even in informed consent cases. *See id.* ("[W]e can envision situations, albeit relatively infrequent, where from ordinary human knowledge and experience the necessity of disclosure is so obvious that expert testimony should not be required."). The patient did not argue that the common knowledge exception applied, so the *Bly* court had no reason to consider its application.

Second, the questions involved in informed-consent cases are more complicated than the questions presented in this case. When a doctor considers whether she has a duty to inform a patient about the risks posed by an upcoming procedure, she must decide whether "the information is material to an informed decision on treatment, and that disclosure would not pose an unreasonable threat of detriment to the patient's well-being or to his ability to make a rational decision." *Id.* at 788. But here, like in *Beverly Enterprises*, the risk was inherent to an *already-existing* condition; neither Blanche nor Pete could avoid the risk by refusing a future medical procedure. All Katlaps and Martin had to decide was whether the information was relevant for the Bushes.

Clearly it was. And even a layman could discern that, in such circumstances, it was unreasonable to say nothing.

Indeed, Katlaps's and Martin's complete silence about the transient alarms is the crucial fact that makes the application of the common knowledge exception appropriate here. Again, the Government's expert testified that it was important for patients to be educated on how to react to alarms. Even accepting as true the expert's testimony that "[t]ransient alarms can be provoked by a large number of events," many of them non-life-threatening, it does not follow that silence was a defensible approach. At the very least, Martin should have told the Bushes that transient alarms were rarely serious, but that they should call her if they heard transient alarms just in case. Had Martin done so, Mary testified she would have sought help for her husband immediately instead of waiting hours to do so.

The Government further argues that "medical malpractice was not within the common knowledge of a layperson" because: its medical expert testified "that there was no malpractice at all"; Katlaps and Martin already knew about the possibility of mechanical failure before they received the Notice; and the parties disputed whether the "transient alarms" mentioned in the Notice were different from the alarms mentioned in the LVAD handbook. The Government's first argument is inapposite. If the common knowledge exception applies, then the district court could adopt the standard of care obvious to even the layman rather than the standard of care advocated by the Government's paid expert. The Government's second argument is unpersuasive. That Katlaps and Martin already knew the information contained in the Notice does not explain why they failed to educate the Bushes about the relevant transient alarms. The Government's third argument is self-defeating. The thrust of the argument is that the word "transient" as used in the Notice was not a technical term with a clear meaning. But if the

No. 14-30896

interpretation of the Notice does not depend on the meaning of technical jargon, the issue is precisely the kind for which expert testimony is unnecessary. Having heard testimony on the nature of the formal alarms emitted by the LVAD, a layman could determine that a "transient" alarm was something different.[12]

Because the district court properly applied the common knowledge exception to Mary's first malpractice theory, we affirm the district court's orders and amended judgment.

## II.

Mary argues that the district court erred when it offset her award by the full amount of her settlement with Thoratec. She contends that her dispute with Thoratec was governed by Louisiana law, and that Louisiana law allows survivorship claims for a decedent's pain and suffering from the time of injury until death. She also contends that Virginia law does not allow such claims. Because Mary asserted a survivorship claim in her petition against Thoratec, she contends that "the settlement of that claim necessarily included that element of damages." And because her settlement award included damages that she could not obtain against the Government under Virginia law, she contends that the district court erred by crediting the Government for whatever portion of her settlement award was based on Pete's survivorship claim. The Government argues that Mary waived this claim by failing to present it to the district court. We agree with the Government.

Litigants waive issues that they fail to present to the district court. *New Orleans Depot Servs., Inc. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 387-88 (5th Cir. 2013) (en banc).

---

[12] The Oxford English Dictionary defines "transient" as "[p]assing by or away with time; not durable or permanent; temporary, transitory; *esp.* passing away quickly or soon, brief, momentary, fleeting." *See* OED Online, http://www.oed.com/view/Entry/204789.

No. 14-30896

In Mary's post-trial motion, she argued that the district court should have awarded her damages for her loss of "society, companionship, comfort, guidance, and kindly offices and advice." She argued in the alternative that, if the court refused to award her damages for these losses, it should reduce the credit given to the Government by the amount of the settlement award that compensated her for the loss of society. Mary's arguments in her post-trial motion did not preserve the issue she presents on appeal. Her argument below was based on a loss-of-society claim, which compensates a surviving spouse for that spouse's *own* suffering *after* the decedent's passing. *See, e.g.*, Restatement (Second) of Torts § 693(1) (1977). Her argument on appeal focuses on a survivorship claim, which compensates a decedent for the *decedent's* suffering *before* death. *See, e.g.*, *id.* § 926. Loss-of-society claims are conceptually distinct from survivorship claims.

Moreover, while a majority of states allow loss-of-society claims, *id.* § 693 cmt. d, only a minority allow survivorship claims, *id.* § 926 cmt. a. Presented with Mary's loss-of-society argument, the district court had little cause to consider: potential differences between Louisiana and Virginia law regarding survivorship claims; whether Mary's settlement with Thoratec included a survivorship award; or, assuming it did, how much of the Thoratec settlement amount was based on Pete's suffering before his death.

Because Mary failed to present the survivorship argument issue in her post-trial motion, we may not consider it on appeal.

### III.

Mary contends that the district court failed to award her damages for loss of society, companionship, comfort, guidance, kindly offices, and advice. She further argues that, because her settlement with Thoratec included an award for such damages, the district court erred by crediting the Government for whatever portion of her settlement award was based on her loss of society,

12

etc. The Government maintains that an award for these damages was "encompassed by the general damages awarded to [the] plaintiff." We agree with the Government.

"A district court's damages award is a finding of fact, which this court reviews for clear error. The conclusions of law underlying the award are reviewed *de novo*." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (per curiam) (footnote omitted).

Virginia law requires courts to use several measures of damages when entering judgments in wrongful death cases. "The verdict or judgment of the court trying the case without a jury shall include . . . damages for," *inter alia*, "[s]orrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent." Va. Code Ann. § 8.01-52. The district court awarded $200,000 in general damages for Mary's "sorrow, mental anguish, and solace" after the loss of her husband. In her post-trial motion, Mary presented the same argument she presses now. The district court rejected the argument, reasoning that section 8.01-52 "clearly indicates that society, companionship, comfort, guidance, kindly offices and advice are subcategories of sorrow, mental anguish, and solace." The district court then explained that "[i]t considered these [subcategories] in fashioning its determination of damages for sorrow, mental anguish, and solace." Because the district court had already compensated Mary for her loss of society, companionship, comfort, kindly offices, and advice, the court found that it was "not necessary or appropriate to increase [the] award."

The district court did not err in interpreting section 8.01-52. The provision's use of the phrase "which may include" indicates that the subcategories that follow are "merely exemplary and not exhaustive," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 133 (2012). Thus, interpreted according to its plain meaning, section 8.01-52

provides that courts must award damages for "[s]orrow, mental anguish, and solace," and that when courts calculate such damages, they may consider, *inter alia*, the loss of the "society, companionship, comfort, guidance, kindly offices and advice of the decedent." Va. Code Ann. § 8.01-52. Mary fails to point to any evidence to refute the district court's assertion that its award included compensation for Mary's loss of society, etc., or to show that the district court's award was insufficient. Accordingly, we hold that the district court did not commit clear error.

## IV.

Mary argues that the district's general damages award was disproportionately smaller than awards in similar cases. We hold that the district court's award was not clearly erroneous or contrary to right reason.

"The amount of damages awarded by the fact finder must be sustained, absent an error of law, unless the reviewing court finds the amount is clearly erroneous, or so gross or inadequate as to be contrary to right reason." *Thompkins v. Belt*, 828 F.2d 298, 301 (5th Cir. 1987) (citations omitted). This court is especially "chary of substituting our views for those of the trial judge" regarding "assessment[s] of damages for grief and emotional distress." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 783 (5th Cir. 1983). Thus, awards "within the permissible range" established in state court cases should not be overturned unless the plaintiff can show "trial error, prejudice, or confusion." *Brun-Jacobo v. Pan Am. World Airways, Inc.*, 847 F.2d 242, 246-47 & n.7 (5th Cir. 1988).

The district court surveyed Virginia damages awards and determined that "general damages [awards] . . . are usually between $150,000.00 and $950,000.00 for each survivor." Mary argues that "[i]n every case highlighted by the Court as similar to this case, damages exceeded those awarded to [her]." Mary ignores *Donathan v. Nicholson*, No. CL04000649-00, 2007 WL 4755239

(Va. Cir. Ct. Dec. 17, 2007), which the district court cited. There, a surgeon attempted to remove a patient's lung without telling his staff, who thought the surgeon was performing a different procedure. The surgeon did not have vascular clamps, which were required for the surgery, or extra blood in case the patient needed a transfusion. The patient suffered blood loss during surgery, which caused a brain injury, which caused the patient's death. A Virginia jury awarded the patient's two daughters $140,000 each for their individual pain and suffering. *See id.*, 2007 WL 4755239.

Because the district court's award is within the permissible range of awards established by the Virginia courts, the district court did not abuse its discretion when it awarded Mary $200,000 in general damages.

## CONCLUSION

For the reasons explained, we AFFIRM the district court's order denying the Government's motion for summary judgment, its order denying the Government's motion for judgment on partial findings, and its amended judgment.